**LODGED**
CLERK, U.S. DISTRICT COURT
12/6/2024
CENTRAL DISTRICT OF CALIFORNIA
BY: \_\_\_\_\_MMC\_\_\_\_\_ DEPUTY

**FILED**
CLERK, U.S. DISTRICT COURT
12/06/2024
CENTRAL DISTRICT OF CALIFORNIA
BY: \_\_\_\_\_CGM\_\_\_\_\_ DEPUTY

E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
JOHN J. LULEJIAN (Cal. Bar No. 186783)
Assistant United States Attorney
    1200 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-0721
    Facsimile: (213) 894-0141
    E-mail:   John.Lulejian@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE EXTRADITION OF<br><br>THOMAS ROBERTSON,<br>  a/k/a "Reece,"<br><br>A Fugitive from the Government of the United Kingdom of Great Britain and Northern Ireland. | No. 2:24-MJ-07241-DUTY<br><br><u>COMPLAINT</u><br><br>FOR ARREST WARRANT AND EXTRADITION (18 U.S.C. § 3184); ORDER THEREON<br><br>**(UNDER SEAL)** |

TO:  Honorable A. Joel Richlin
     United States Magistrate Judge
     Central District of California

I, John J. Lulejian, being duly sworn, depose and state that I am an Assistant United States Attorney for the Central District of California and act for the United States in fulfilling its obligations to the Government of the United Kingdom of Great Britain and Northern Ireland (the "United Kingdom") pursuant to the Extradition Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland, and related Exchanges of Letters, U.S.-U.K.,

Mar. 31, 2003, S. Treaty Doc No. 108-23 (2004), as amended by the Instrument as Contemplated by Article 3(2) of the Agreement on Extradition Between the United States of America and the European Union Signed 25 June 2003, As to the Application of the Extradition Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland signed 31 March 2003, U.S.-U.K., Dec. 16, 2004, S. Treaty Doc. No. 109-14 (2006), with Annex, which reflects the integrated text of the operative provisions of the 2003 Treaty and the Instrument (collectively referenced hereafter as the "Treaty"), with respect to the fugitive, THOMAS ROBERTSON, also known as "Reece" ("ROBERTSON"; DOB: \*\*/\*\*/1998).

In accordance with Title 18, United States Code, Section 3184, I charge on information and belief as follows:

1. Pursuant to the Treaty, the United Kingdom has submitted a formal request to the United States, through diplomatic channels, for the extradition of ROBERTSON.

2. That according to the information provided by the United Kingdom, ROBERTSON has been charged with (1) two counts of supplying a Class A controlled drug, namely Diamorphine[1] and Cocaine, to another, in contravention of Section 4(3)(b) of the Misuse of Drugs Act of 1971; and (2) one count of threatening and abusive behavior, contrary to Section 38 (1) of the Criminal Justice and Licensing (Scotland) Act of 2010.

3. That the offenses for which ROBERTSON's extradition is sought were committed within the jurisdiction of the United Kingdom.

---

[1] I am informed and believe that heroin is also known as diamorphine.

2

4.     That on or about April 27, 2020, the Sheriff of Tayside, Central and Fife at Dunfermline issued a warrant for ROBERTSON's arrest for each of the above offenses.[2]  ROBERTSON was released on bail and was later indicted on or about April 13, 2021.  Although he attended several procedural hearings, pleaded not guilty, he failed to attend his trial, which was scheduled to commence on May 3, 2023.  On or about May 4, 2023, S. Duff, Sheriff of Tayside, Central and Fife at Dunfermline, issued a warrant for ROBERTSON's post-indictment arrest for each of the above offenses.

5.     That the Government of the United Kingdom presents the following facts as the basis for the criminal charges and arrest warrant, based on the evidence of the case, including, but not limited to multiple witness and police statements, text messages, and bank records:[3]

   a.     On or about April 19, 2020, P.S. and J.C., both crack cocaine and heroin users and dealers met with their drug dealer "Johnny" at their house located in Dunfermline, Scotland (the "house").  "Johnny" was accompanied at the time by two individuals who spoke with a Glaswegian accent and who identified themselves as "Reece" and "Sam."  "Reece" later identified himself to law enforcement as ROBERTSON.  "Sam" identified himself to law enforcement as Freegent."

   b.     ROBERTSON and Freegent provided P.S. with approximately 9 ounces (approximately 255 g) of heroin (diamorphine).

---

[2] According to authorities in Scotland, the competent judge in committal proceedings is the Sheriff.

[3] These statements include those given to the police by P.S. and J.C. about their interactions and Leskey Freegent ("Freegent"), ROBERTSON's co-defendant in the United Kingdom.

ROBERTSON and Freegent instructed P.S. to sell the heroin, but did not provide any specific timeline for repayment. ROBERTSON also gave P.S. his telephone number and left her the keys to a red Mercedes car parked close to the house.

  c. Although J.C. was not present at the house when ROBERTSON gave P.S. the heroin, he received a telephone call from P.S. informing him that ROBERTSON and Freegent gave her a large quantity of drugs. When he returned to the house, he learned from P.S. that ROBERTSON and Freegent instructed them to sell the drugs.

  d. On or about the following morning, ROBERTSON telephoned P.S. and requested £1,000 (approximately $1,300) as an initial payment for the heroin. ROBERTSON instructed P.S. to place the money in the glovebox of the red Mercedes, which he advised would be picked up later in the day. P.S. complied and placed £650 (approximately $630) in the glovebox of the vehicle. When a truck arrived to recover the Mercedes, a neighbor heard P.S. tell the male driver of the truck that "the money [was] in the glove box."

  e. At approximately 5:00 p.m., ROBERTSON returned with half an ounce (approximately 14 g) of crack cocaine for P.S. and J.C. to sell. He informed them that they owed him £800 (approximately $1000). Rather than sell the crack cocaine, P.S. and J.C. used the drug themselves that same night.

  f. On or about April 23, 2020, ROBERTSON came to the house with 52 additional grams of crack cocaine and P.S. paid him £400 (approximately $500) that she had withdrawn from her bank account. According to P.S., ROBERTSON told her that she and J.C. still owed him £5900 (approximately $7,500).

4

  g. In total, ROBERTSON had provided P.S. and J.C. with approximately 9 ounces (approximately 255 grams) of heroin (diamorphine) and approximately 66 grams of crack cocaine. Scottish police valued the street value of the heroin (diamorphine) alone at approximately £11,025 (approximately $14,100).

  h. ROBERTSON continued to telephone the following days demanding increasingly large sums of money for the drugs and showing up at the house demanding payment. According to J.C., on or about April 24, 2020, ROBERTSON came to their house, demanded payment, and took J.C. to an ATM to procure the funds. Because J.C. did not have enough funds in his account, he was unable to make any payments that day. According to P.S., even though she paid an additional £400 (approximately $500) to ROBERTSON that day, he continued to make several telephone calls demanding an additional £1000 (approximately $1,300) to be paid the following day.

  i. According to P.S., on or about April 26, 2020, ROBERTSON called her and demanded a further payment of £2000 (approximately $2,600). When he arrived at the house, when J.C. was absent, RORBERTSON shouted at P.S. and told her he was "going to burn the house down" with her and J.C. inside it. N.H., P.S.'s friend, was present and witnessed ROBERTSON arrive and make his threats. P.S. then called J.C. and informed him of ROBERTSON's threats and demands. J.C. told the police that he went to his sister and obtained £300 (approximately $400), which he gave to P.S. before going back out to source more money.

  j. Later that same day, ROBERTSON and Freegent returned to the house and made additional threats. According to P.S.,

5

ROBERTSON and Freegent shouted at her and threatened to put her in a "life threatening situation" if she failed to pay.  They refused to leave the house unless they received payment.  P.S. also stated that she was terrified and was crying.  P.S. made an excuse to leave the house by telling ROBERTSON and Freegent that she would source cannabis.  Once outside, she called J.C. and then called the police.

   k. Several witnesses described P.S.'s state at the time.  For example, J.C. described P.S. as being "really upset" that "she sounded petrified" and "was crying her eyes out."  According to N.H., when P.S. was outside of the house, she was "hysterical and crying," and that P.S. was terrified to go back into the house, where two males were inside.  A neighbor described P.S. as being in a hysterical state while speaking on the telephone.

   l. At approximately 6:00 p.m., the police entered the house and arrested ROBERTSON and Freegent.  Officers accompanied P.S. to the house and subsequently described her as in "apparent" fear, that she was "petrified in her appearance and manner," and was "howling in tears."  Police seized P.S.'s mobile telephone, a polythene bag that P.S. pointed them to as containing a brown powder, later determined to be heroin (diamorphine) provided by ROBERTSON and Freegent, and a mobile telephones belonging to ROBERTSON and Freegent.

   m. The polyethene bag contained approximately 166.78 grams of heroin (diamorphine) or just short of six ounces of the drug.  British law enforcement estimated the street value of the heroin (diamorphine) at £8,325 (approximately $11,000) if sold in "0.5 gram deals" at £25 (approximately $30) each.  The police

concluded that this amount indicated supply and not personal use. Police also concluded based on P.S.'s statement that she received 9 ounces from ROBERTSON, that at least a further three ounces valued at approximately £2700 (approximately $3,500) had already been supplied or used.

6. United Kingdom and U.S. law enforcement believes that ROBERTSON may be found within the jurisdiction:

a. United Kingdom authorities determined that ROBERTSON left Glasgow in or about September 2021, lived in Spain and the Netherlands, and left for South America in or about May 2023. ROBERSTON is believed to have entered the United States from Mexico on or about May 11, 2023, through one of the ports of entry near San Diego, California. Further, as of May 2024, Scottish authorities believed that ROBERTSON was residing in East Stroudsburg, Pennsylvania.

b. On or about June 1, 2024, representatives of the Los Angeles County Sherriff's Department ("LASD") responded to call at a tanning salon in Saugus, California. According to the LASD report, ROBERTSON was yelling, cursing, and throwing items at an employee of the tanning salon. The LASD report lists an address in Castiac, California, as ROBERTSON's residence address. The report also includes ROBERTSON's cellular telephone, which has an area code of 215.[4]

c. On or about July 19, 2024, T.M., a known associate of ROBERTSON, entered the United States. On T.M.'s Electronic System

---

[4] I am informed and believe that area code 215 is a telephone area code in Pennsylvania that covers Philadelphia and parts of Bucks, Montgomery, Lehigh, and Berks counties.

7

for Travel Authorization application ("ESTA"), she listed two addresses in Los Angeles, California, where she would be staying. According to law enforcement, T.M., who has no other known associates in the United States, departed the United States on or about July 26, 2024. Although United Kingdom law enforcement believed that ROBERTSON was residing at one of the addresses that T.M. listed on her ESTA application, the United States Marshal Service ("USMS") was not able to locate ROBERTSON.

        d.  In or about August 2024, United Kingdom authorities believed that ROBERTSON was residing at a rental home/AirBnB in the Hollywood Hills, not far from one of the one of the above addresses that T.M. listed on her ESTA application and where United Kingdom law enforcement believed ROBERTSON used as his residence. United Kingdom law enforcement also intercepted a photograph of that ROBERTSON sent on WhatsApp with the words, "Thomas Robertson New" above the steering wheel of a Lamborghini, a vehicle that he had been known to drive in the past.

        e.  United Kingdom law enforcement recently learned that on or about December 4, 2024, T.M., booked a round-trip ticket from Glasgow, Scotland to Los Angeles, California. T.M. is scheduled to arrive at Los Angeles International Airport on December 6, 2024, at approximately 5:55 p.m. on British Airways flight no. BA1502 (American Airlines flight no. AA135). She is scheduled to return to Glasgow, Scotland on December 13, 2024. T.M. provided an address in Malibu, California. United Kingdom authorities believe that T.M. will meet with ROBERTSON during her visit.

    f. Based on the foregoing and information developed during their investigations, United Kingdom and United States law enforcement believes that ROBERTSON has been and currently is in the Central District of California since or about June 2024.

  7. Tom Heinemann, an attorney in the Office of the Legal Adviser for the U.S. Department of State, has provided the U.S. Department of Justice with a declaration authenticating a copy of the diplomatic note by which the United Kingdom made its request for extradition, stating that Article 2 of the Annex covers the offenses for which the United Kingdom seeks extradition, and confirming that the documents supporting the request for extradition bear the certificate or seal of the of the Ministry of Justice, or the Ministry or Department responsible for foreign affairs of the United Kingdom, in accordance with Article 9 of the Annex, so as to enable them to be received in evidence.

  8. The declaration from the U.S. Department of State with its attachments, including a copy of the diplomatic note from the United Kingdom, a copy of the Treaty, and the certified documents submitted in support of the request are attached to the Request for Certification of Extradition, filed separately and contemporaneously with this complaint and incorporated by reference herein.

  9. That ROBERTSON is likely to flee if he learns of the existence of a warrant for his arrest.

  WHEREFORE, the undersigned complainant requests that a warrant for the arrest of ROBERTSON be issued in accordance with 18 U.S.C. § 3184 and the Extradition Treaty between the United States and the United Kingdom, so that BEROUAIN may be arrested and brought before

9

this Court to the end that the evidence of criminality may be heard and considered, and that this complaint and the warrant be placed under the seal of the Court, except as disclosure is needed for its execution, until such time as the warrant is executed.

DATED: This 6th day of December, 2024, at Los Angeles County, California.

Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

JOHN J. LULEJIAN
Assistant United States Attorney

Attorneys for Complainant
UNITED STATES OF AMERICA

Subscribed and sworn to by the applicant in person on this 6th day of December, 2024.

_____
HONORABLE A. JOEL RICHLIN
UNITED STATES MAGISTRATE JUDGE