# EXHIBITS

DECLARATION OF TOM HEINEMANN

I, Tom Heinemann, declare and say as follows:

1. I am an Attorney Adviser in the Office of the Legal Adviser for the Department of State, Washington, DC.  This office has responsibility for extradition requests, and I am charged with the extradition case of Thomas Robertson.  I make the following statements based upon my personal knowledge and upon information made available to me in the performance of my official duties.

2. The relevant and applicable treaty provisions in full force and effect between the United States and the United Kingdom are found in the Extradition Treaty between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland, and related Exchanges of Letters, signed at Washington March 31, 2003 (the "Treaty"), and the Instrument as contemplated by Article 3(2) of the Agreement on Extradition between the United States of America and the European Union signed June 25, 2003, as to the application of the Extradition Treaty between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland signed March 31, 2003 (the "Instrument"), with annex (the "Annex") and related Exchanges of Notes, signed at London December 16, 2004.  A copy of the Instrument and Annex is attached to this declaration.

3. In accordance with the provisions of the Annex, the British Embassy has submitted Embassy Note No. 078/2024, dated 12 July 2024, formally requesting the extradition of Thomas Robertson.  A copy of the diplomatic note is attached to this declaration.

4. In accordance with Article 20 of the Annex, the Government of the United States appears in court in the United States on behalf of, and represents the interests of, the United Kingdom in any proceeding that arises out of a U.K. request for Extradition. The United

Kingdom provides the same legal representation in its courts on behalf of the United States with regard to extradition requests made by the United States.

5. The offenses for which extradition is sought are covered under Article 2 of the Annex.

6. Under Article 9 of the Annex, documents that bear the certificate or seal of the Ministry of Justice or Ministry or Department responsible for foreign affairs of the Requesting State are admissible in extradition proceedings without further certification, authentication or other legalization. Therefore, such documents satisfy the authentication requirements without the need for certification by the U.S. Embassy in London. The United Kingdom, in submitting documents in the instant case that bear the certificate or seal of the Home Office, has complied with the Annex with respect to authentication.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed in Santa Fe, New Mexico, on July 31st, 2024.

TOM HEINEMANN

Attachments:

1. Copy of Note

2. Copy of Instrument with Annex

TREATIES AND OTHER INTERNATIONAL ACTS SERIES 10-201.23

# EXTRADITION

**Instrument Amending the**

**Treaty of March 31, 2003**

**Between the**

**UNITED STATES OF AMERICA**

**and the UNITED KINGDOM OF**

**GREAT BRITAIN AND**

**NORTHERN IRELAND**

Signed at London December 16, 2004

*with*

Annex

*and*

Exchange of Notes



NOTE BY THE DEPARTMENT OF STATE

Pursuant to Public Law 89—497, approved July 8, 1966
(80 Stat. 271; 1 U.S.C. 113)—

". . .the Treaties and Other International Acts Series issued
under the authority of the Secretary of State shall be competent
evidence . . . of the treaties, international agreements other than
treaties, and proclamations by the President of such treaties and
international agreements other than treaties, as the case may be,
therein contained, in all the courts of law and equity and of maritime
jurisdiction, and in all the tribunals and public offices of the
United States, and of the several States, without any further proof
or authentication thereof."

# UNITED KINGDOM OF GREAT BRITAIN AND NORTHERN IRELAND

## Extradition

*Instrument amending the treaty of March 31, 2003.*
*Signed at London December 16, 2004;*
*Transmitted by the President of the United States of America*
*to the Senate September 28, 2006 (Treaty Doc. 109-14,*
*109th Congress, 2d Session);*
*Reported favorably by the Senate Committee on Foreign Relations*
*July 29, 2008 (Senate Executive Report No. 110-12,*
*110th Congress, 2d Session);*
*Advice and consent to ratification by the Senate*
*September 23, 2008;*
*Ratified by the President December 11, 2008;*
*Exchange of Instruments of Ratification*
*at London July 6, 2009;*
*Entered into force February 1, 2010.*
*With annex and exchange of notes.*

Instrument as contemplated by Article 3(2) of the Agreement on Extradition
between the United States of America and the European Union signed 25 June 2003, as
to the application of the Extradition Treaty between
the Government of the United States of America and the Government of the
United Kingdom of Great Britain and Northern Ireland signed 31 March 2003

1.     As contemplated by Article 3(2) of the Agreement on Extradition between the
United States of America and the European Union signed 25 June 2003 (hereafter "the
Extradition Agreement"), the Governments of the United States of America and the
United Kingdom of Great Britain and Northern Ireland acknowledge that, in accordance
with the provisions of this Instrument, the Extradition Agreement is applied in relation
to the bilateral Extradition Treaty between the Government of the United States of
America and the Government of the United Kingdom of Great Britain and Northern
Ireland signed 31 March 2003 (hereafter "the 2003 Extradition Treaty") under the
following terms:

a)     Article 5(1) of the Extradition Agreement shall be applied as set forth in
Article 8(1) and 12(4) of the Annex to this Instrument to provide for the mode of
transmission of the extradition request and supporting documents;

b)     Article 5(2) of the Extradition Agreement shall be applied as set forth in
Article 9 of the Annex to this Instrument to provide for the requirements concerning
certification, authentication or legalization of the extradition request and supporting
documents;

c)     Article 7(1) of the Extradition Agreement shall be applied as set forth in
Article 12(4) of the Annex to this Instrument to provide for an alternative method for
transmission of the request for extradition and supporting documents following
provisional arrest;

d)     Article 8(2) of the Extradition Agreement shall  be applied as set forth in
Article 10(2) of the Annex to this Instrument to provide for the channel to be used for
submitting supplementary information;

e)     Article 10 of the Extradition Agreement shall be applied as set forth in
Article 15 of the Annex to this Instrument to provide for the decision on requests made
by several States for the extradition or surrender of the same person; and

f)     Article 14 of the Extradition Agreement shall be applied as set forth in Article
8 bis of the Annex to this Instrument to provide for consultations where the Requesting
State contemplates the submission of particularly sensitive information in support of a
request for extradition.

2.     The Annex reflects the integrated text of the operative provisions of the
2003 Extradition Treaty and the Extradition Agreement that shall apply upon entry into
force of this Instrument.

3.a)   This Instrument shall apply to the United States of America and to Great Britain and
Northern Ireland.  Subject to subparagraph b), the application of the 2003 Extradition Treaty to
the Channel Islands, the Isle of Man, and any other territory of the United Kingdom to which

1

the 2003 Extradition Treaty may apply in accordance with its terms, shall remain unaffected by the Extradition Agreement and this Instrument.

b)    This Instrument shall not apply to any territory for whose international relations the United Kingdom is responsible unless the United States of America and the European Union, by exchange of diplomatic notes duly confirmed by the United Kingdom in accordance with Article 20(1) (b) of the Extradition Agreement, agree to extend its application thereto. The exchange of notes shall specify the authority in the territory responsible for the measure set forth in Article 9 of the Annex and the channels between the United States of America and the territory for transmissions pertaining to the extradition process, in lieu of those designated in the Annex. Such application may be terminated by either the United States of America or the European Union by giving six months' written notice to the other through the diplomatic channel, where duly confirmed between the United States of America and the United Kingdom in accordance with Article 20(2) of the Extradition Agreement.

4.    In accordance with Article 16 of the Extradition Agreement, this Instrument shall apply to offenses committed before as well as after it enters into force.

5.    This Instrument shall not apply to requests for extradition made prior to its entry into force.

6.    (a) This Instrument shall be subject to the completion by the United States of America and the United Kingdom of Great Britain and Northern Ireland of their respective applicable internal procedures for entry into force. The Governments of the United States of America and the United Kingdom of Great Britain and Northern Ireland shall thereupon exchange instruments indicating that such measures have been completed. This Instrument shall enter into force on the date of entry into force of the Extradition Agreement.

(b)    In the event of termination of the Extradition Agreement, this Instrument shall be terminated and the 2003 Extradition Treaty shall be applied. The Governments of the United States of America and the United Kingdom of Great Britain and Northern Ireland nevertheless may agree to continue to apply some or all of the provisions of this Instrument.

IN WITNESS WHEREOF, the undersigned, being duly authorized by their respective Governments, have signed this Instrument.

DONE at London, in duplicate, this 16 day of December 2004.

FOR THE GOVERNMENT OF
UNITED STATES OF AMERICA:

FOR THE GOVERNMENT OF
THE UNITED KINGDOM OF GREAT
BRITAIN AND NORTHERN IRELAND:

2

ANNEX

EXTRADITION TREATY
BETWEEN
THE GOVERNMENT OF THE UNITED STATES OF AMERICA
AND
THE GOVERNMENT OF THE UNITED KINGDOM OF GREAT BRITAIN AND
NORTHERN IRELAND

## TABLE OF CONTENTS

| | |
|---|---|
| Article 1 | Obligation to Extradite |
| Article 2 | Extraditable Offenses |
| Article 3 | Nationality |
| Article 4 | Political and Military Offenses |
| Article 5 | Prior Prosecution |
| Article 6 | Statute of Limitations |
| Article 7 | Capital Punishment |
| Article 8 | Extradition Procedures and Required Documents |
| Article 8 *bis* | Sensitive Information in a Request |
| Article 9 | Authentication of Documents |
| Article 10 | Additional Information |
| Article 11 | Translation |
| Article 12 | Provisional Arrest |
| Article 13 | Decision and Surrender |
| Article 14 | Temporary and Deferred Surrender |
| Article 15 | Requests for Extradition or Surrender Made by Several States |
| Article 16 | Seizure and Surrender of Property |
| Article 17 | Waiver of Extradition |
| Article 18 | Rule of Specialty |
| Article 19 | Transit |
| Article 20 | Representation and Expenses |
| Article 21 | Consultation |
| Article 22 | Termination |

3

### Article 1
### Obligation to Extradite

The Parties agree to extradite to each other, pursuant to the provisions of this Treaty, persons sought by the authorities in the Requesting State for trial or punishment for extraditable offenses.

### Article 2
### Extraditable Offenses

1.    An offense shall be an extraditable offense if the conduct on which the offense is based is punishable under the laws in both States by deprivation of liberty for a period of one year or more or by a more severe penalty.

2.    An offense shall also be an extraditable offense if it consists of an attempt or a conspiracy to commit, participation in the commission of, aiding or abetting, counseling or procuring the commission of, or being an accessory before or after the fact to any offense described in paragraph 1 of this Article.

3.    For the purposes of this Article, an offense shall be an extraditable offense:

     (a)    whether or not the laws in the Requesting and Requested States place the offense within the same category of offenses or describe the offense by the same terminology; or

     (b)    whether or not the offense is one for which United States federal law requires the showing of such matters as interstate transportation, or use of the mails or of other facilities affecting interstate or foreign commerce, such matters being jurisdictional only.

4.    If the offense has been committed outside the territory of the Requesting State, extradition shall be granted in accordance with the provisions of the Treaty if the laws in the Requested State provide for the punishment of such conduct committed outside its territory in similar circumstances. If the laws in the Requested State do not provide for the punishment of such conduct committed outside of its territory in similar circumstances, the executive authority of the Requested State, in its discretion, may grant extradition provided that all other requirements of this Treaty are met.

5.    If extradition has been granted for an extraditable offense, it may also be granted for any other offense specified in the request if the latter offense is punishable by less than one year's deprivation of liberty, provided that all other requirements for extradition are met.

4

Article 3
Nationality

Extradition shall not be refused based on the nationality of the person sought.

Article 4
Political and Military Offenses

1.    Extradition shall not be granted if the offense for which extradition is requested is a political offense.

2.    For the purposes of this Treaty, the following offenses shall not be considered political offenses:

(a)    an offense for which both Parties have the obligation pursuant to a multilateral international agreement to extradite the person sought or to submit the case to their competent authorities for decision as to prosecution;

(b)    a murder or other violent crime against the person of a Head of State of one of the Parties, or of a member of the Head of State's family;

(c)    murder, manslaughter, malicious wounding, or inflicting grievous bodily harm;

(d)    an offense involving kidnapping, abduction, or any form of unlawful detention, including the taking of a hostage;

(e)    placing or using, or threatening the placement or use of, an explosive, incendiary, or destructive device or firearm capable of endangering life, of causing grievous bodily harm, or of causing substantial property damage;

(f)    possession of an explosive, incendiary, or destructive device capable of endangering life, of causing grievous bodily harm, or of causing substantial property damage;

(g)    an attempt or a conspiracy to commit, participation in the commission of, aiding or abetting, counseling or procuring the commission of, or being an accessory before or after the fact to any of the foregoing offenses.

3.    Notwithstanding the terms of paragraph 2 of this Article, extradition shall not be granted if the competent authority of the Requested State determines that the request was politically motivated. In the United States, the executive branch is the competent authority for the purposes of this Article.

5

4.     The competent authority of the Requested State may refuse extradition for offenses under military law that are not offenses under ordinary criminal law.  In the United States, the executive branch is the competent authority for the purposes of this Article.

## Article 5
### Prior Prosecution

1.     Extradition shall not be granted when the person sought has been convicted or acquitted in the Requested State for the offense for which extradition is requested.

2.     The Requested State may refuse extradition when the person sought has been convicted or acquitted in a third state in respect of the conduct for which extradition is requested.

3.     Extradition shall not be precluded by the fact that the competent authorities of the Requested State:

(a)     have decided not to prosecute the person sought for the acts for which extradition is requested;

(b)     have decided to discontinue any criminal proceedings which have been instituted against the person sought for those acts; or

(c)     are still investigating the person sought for the same acts for which extradition is sought.

## Article 6
### Statute of Limitations

The decision by the Requested State whether to grant the request for extradition shall be made without regard to any statute of limitations in either State.

## Article 7

### Capital Punishment

When the offense for which extradition is sought is punishable by death under the laws in the Requesting State and is not punishable by death under the laws in the Requested State, the executive authority in the Requested State may refuse extradition unless the Requesting State provides an assurance that the death penalty will not be imposed, or, if imposed, will not be carried out.

6

Article 8
Extradition Procedures and Required Documents

1.    All requests for extradition shall be submitted through the diplomatic
channel.

2.    All requests for extradition shall be supported by:

    (a)    as accurate a description as possible of the person sought,
together with any other information that would help to establish
identity and probable location;

    (b)    a statement of the facts of the offense(s);

    (c)    the relevant text of the law(s) describing the essential elements of
the offense for which extradition is requested;

    (d)    the relevant text of the law(s) prescribing punishment for the
offense for which extradition is requested; and

    (e)    documents, statements, or other types of information specified in
paragraphs 3 or 4 of this Article, as applicable.

3.    In addition to the requirements in paragraph 2 of this Article, a request
for extradition of a person who is sought for prosecution shall be supported by:

    (a)    a copy of the warrant or order of arrest issued by a judge or other
competent authority;

    (b)    a copy of the charging document, if any; and

    (c)    for requests to the United States, such information as would
provide a reasonable basis to believe that the person sought
committed the offense for which extradition is requested.

4.    In addition to the requirements in paragraph 2 of this Article, a request
for extradition relating to a person who has been convicted of the offense for which
extradition is sought shall be supported by:

    (a)    information that the person sought is the person to whom the
finding of guilt refers;

    (b)    a copy of the judgment or memorandum of conviction or, if a
copy is not available, a statement by a judicial authority that the
person has been convicted;

    (c)    a copy of the sentence imposed, if the person sought has been
sentenced, and a statement establishing to what extent the
sentence has been carried out; and

7

(d)    in the case of a person who has been convicted *in absentia*, information regarding the circumstances under which the person was voluntarily absent from the proceedings.

### Article 8 bis
### Sensitive Information in a Request

Where the Requesting State contemplates the submission of particularly sensitive information in support of its request for extradition, it may consult the Requested State to determine the extent to which the information can be protected by the Requested State. If the Requested State cannot protect the information in the manner sought by the Requesting State, the Requesting State shall determine whether the information shall nonetheless be submitted.

### Article 9
### Authentication of Documents

Documents that bear the certificate or seal of the Ministry of Justice, or Ministry or Department responsible for foreign affairs, of the Requesting State shall be admissible in extradition proceedings in the Requested State without further certification, authentication, or other legalization. "Ministry of Justice" shall mean, for the United States, the United States Department of Justice; and, for the United Kingdom, the Home Office.

### Article 10
### Additional Information

1.    If the Requested State requires additional information to enable a decision to be taken on the request for extradition, the Requesting State shall respond to the request within such time as the Requested State requires.

2.    Such additional information may be requested and furnished directly between the United States Department of Justice and the Home Office.

### Article 11
### Translation

All documents submitted under this Treaty by the Requesting State shall be in English or accompanied by a translation into English.

### Article 12
### Provisional Arrest

1.    In an urgent situation, the Requesting State may request the provisional arrest of the person sought pending presentation of the request for extradition. A

8

request for provisional arrest may be transmitted through the diplomatic channel or
directly between the United States Department of Justice and such competent authority
as the United Kingdom may designate for the purposes of this Article.

    2.      The application for provisional arrest shall contain:

        (a)    a description of the person sought;

        (b)    the location of the person sought, if known;

        (c)    a brief statement of the facts of the case including, if possible, the
date and location of the offense(s);

        (d)    a description of the law(s) violated;

        (e)    a statement of the existence of a warrant or order of arrest or a
finding of guilt or judgment of conviction against the person
sought; and

        (f)    a statement that the supporting documents for the person sought
will follow within the time specified in this Treaty.

    3.      The Requesting State shall be notified without delay of the disposition of
its request for provisional arrest and the reasons for any inability to proceed with the
request.

    4.      A person who is provisionally arrested may be discharged from custody
upon the expiration of sixty (60) days from the date of provisional arrest pursuant to this
Treaty if the executive authority of the Requested State has not received the formal
request for extradition and the documents supporting the extradition request as required
in Article 8. For this purpose, receipt of the formal request for extradition and
supporting documents by the Embassy of the Requested State in the Requesting State
shall constitute receipt by the executive authority of the Requested State.

    5.      The fact that the person sought has been discharged from custody
pursuant to paragraph 4 of this Article shall not prejudice the subsequent re-arrest and
extradition of that person if the extradition request and supporting documents are
delivered at a later date.

Article 13
Decision and Surrender

    1.      The Requested State shall promptly notify the Requesting State of its
decision on the request for extradition. Such notification should be transmitted directly
to the competent authority designated by the Requesting State to receive such
notification and through the diplomatic channel.

9

2.      If the request is denied in whole or in part, the Requested State shall
provide reasons for the denial.  The Requested State shall provide copies of pertinent
judicial decisions upon request.

3.      If the request for extradition is granted, the authorities of the Requesting
and Requested States shall agree on the time and place for the surrender of the person
sought.

4.      If the person sought is not removed from the territory of the Requested
State within the time period prescribed by the law of that State, that person may be
discharged from custody, and the Requested State, in its discretion, may subsequently
refuse extradition for the same offense(s).

## Article 14
### Temporary and Deferred Surrender

1.      If the extradition request is granted for a person who is being proceeded
against or is serving a sentence in the Requested State, the Requested State may
temporarily surrender the person sought to the Requesting State for the purpose of
prosecution.  If the Requested State requests, the Requesting State shall keep the person
so surrendered in custody and shall return that person to the Requested State after the
conclusion of the proceedings against that person, in accordance with conditions to be
determined by mutual agreement of the States.

2.      The Requested State may postpone the extradition proceedings against a
person who is being prosecuted or who is serving a sentence in that State.  The
postponement may continue until the prosecution of the person sought has been
concluded or until such person has served any sentence imposed.

## Article 15
### Requests for Extradition or Surrender Made by Several States

1.      If the Requested State receives requests from the Requesting State and
from any other State or States for the extradition of the same person, either for the same
offense or for different offenses, the executive authority of the Requested State shall
determine to which State, if any, it will surrender the person.

2.      If the United Kingdom receives an extradition request from the United
States and a request for surrender pursuant to the European arrest warrant for the same
person, either for the same offense or for different offenses, its executive authority shall
determine to which State, if any, it will surrender the person.

3.      In making its decision under paragraphs 1 and 2 of this Article, the
Requested State shall consider all of the relevant factors, including, but not limited to,
the following:

10

(a)    whether the requests were made pursuant to a treaty;

(b)    the places where each of the offenses was committed;

(c)    the respective interests of the requesting States;

(d)    the seriousness of the offenses;

(e)    the nationality of the victim;

(f)    the possibility of any subsequent extradition between the requesting
States; and

(g)    the chronological order in which the requests were received from the
requesting States.

## Article 16
## Seizure and Surrender of Property

1.    To the extent permitted under its law, the Requested State may seize and surrender to the Requesting State all items in whatever form, and assets, including proceeds, that are connected with the offense in respect of which extradition is granted. The items and assets mentioned in this Article may be surrendered even when the extradition cannot be effected due to the death, disappearance, or escape of the person sought.

2.    The Requested State may condition the surrender of the items upon satisfactory assurances from the Requesting State that the property will be returned to the Requested State as soon as practicable. The Requested State may also defer the surrender of such items if they are needed as evidence in the Requested State.

## Article 17
## Waiver of Extradition

If the person sought waives extradition and agrees to be surrendered to the Requesting State, the Requested State may surrender the person as expeditiously as possible without further proceedings.

## Article 18
## Rule of Specialty

1.    A person extradited under this Treaty may not be detained, tried, or punished in the Requesting State except for:

(a)    any offense for which extradition was granted, or a differently
denominated offense based on the same facts as the offense on
which extradition was granted, provided such offense is
extraditable, or is a lesser included offense;

(b)    any offense committed after the extradition of the person; or

(c)    any offense for which the executive authority of the Requested
State waives the rule of specialty and thereby consents to the

11

person's detention, trial, or punishment. For the purpose of this
subparagraph:

    (i)    the executive authority of the Requested State may require
the submission of the documentation called for in Article
8; and

    (ii)    the person extradited may be detained by the Requesting
State for 90 days, or for such longer period of time as the
Requested State may authorize, while the request for
consent is being processed.

    2.    A person extradited under this Treaty may not be the subject of onward
extradition or surrender for any offense committed prior to extradition to the Requesting
State unless the Requested State consents.

    3.    Paragraphs 1 and 2 of this Article shall not prevent the detention, trial, or
punishment of an extradited person, or the extradition of the person to a third State, if
the person:

    (a)    leaves the territory of the Requesting State after extradition and
voluntarily returns to it; or

    (b)    does not leave the territory of the Requesting State within 20
days of the day on which that person is free to leave.

    4.    If the person sought waives extradition pursuant to Article 17, the
specialty provisions in this Article shall not apply.

### Article 19
### Transit

    1.    Either State may authorize transportation through its territory of a person
surrendered to the other State by a third State or from the other State to a third State. A
request for transit shall contain a description of the person being transported and a brief
statement of the facts of the case. A person in transit shall be detained in custody during
the period of transit.

    2.    Authorization is not required when air transportation is used by one State
and no landing is scheduled on the territory of the other State. If an unscheduled
landing does occur, the State in which the unscheduled landing occurs may require a
request for transit pursuant to paragraph 1 of this Article, and it may detain the person
until the request for transit is received and the transit is effected, as long as the request is
received within 96 hours of the unscheduled landing.

12

Article 20
Representation and Expenses

1.     The Requested State shall advise, assist, and appear on behalf of, the Requesting State in any proceedings in the courts of the Requested State arising out of a request for extradition or make all necessary arrangements for the same.

2.     The Requesting State shall pay all the expenses related to the translation of extradition documents and the transportation of the person surrendered.  The Requested State shall pay all other expenses incurred in that State in connection with the extradition proceedings.

3.     Neither State shall make any pecuniary claim against the other State arising out of the arrest, detention, examination, or surrender of persons under this Treaty.

Article 21
Consultation

The Parties may consult with each other in connection with the processing of individual cases and in furtherance of efficient implementation of this Treaty.

Article 22
Termination

Either State may terminate this Treaty at any time by giving written notice to the other State through the diplomatic channel, and the termination shall be effective six months after the date of receipt of such notice.

13

EMBASSY OF THE
UNITED STATES OF AMERICA

No. 120

The Embassy of the United States of America at London, England, presents its
compliments to Her Majesty's Principal Secretary of State for Foreign and Commonwealth
Affairs and has the honor to refer to the Instrument as contemplated by Article 3(2) of the
Agreement on Extradition between the United States of America and the European Union
signed June 25, 2003, as to the application of the Extradition Treaty between the
Government of the United States of America and the Government of the United Kingdom
of Great Britain and Northern Ireland signed March 31, 2003 (the "2003 Extradition
Treaty").

Having been informed by the Government of the United Kingdom of Great Britain
and Northern Ireland that it will be unable to apply Article 5(2) of the Agreement on
Extradition between the United States of America and the European Union, as set forth in
Article 9 of the Annex to the Instrument, relating to authentication of extradition
documents, until a corresponding change is made in its domestic law governing extradition,
the Embassy has the honor to propose on behalf of the United States Government as
follows:

Article 5(2) of the Agreement on Extradition between the United States of America
and the European Union, as set forth in Article 9 of the Annex to the Instrument, shall not
be applied until the Government of the United States of America and the Government of
the United Kingdom of Great Britain and Northern Ireland indicate in a subsequent
exchange of notes that the required internal procedures have been completed. Until that
time, the parties agree to apply the procedure for authentication of extradition documents
set forth in Article 9 of the Extradition Treaty between the Government of the United
States of America and the Government of the United Kingdom of Great Britain and
Northern Ireland signed March 31, 2003, upon its entry into force. The Government of the
United Kingdom of Great Britain and Northern Ireland shall undertake to seek the
necessary legislation at the earliest possible time.

The Embassy also wishes to confirm that two exchanges of letters related to the
2003 Extradition Treaty and done simultaneous with its signature shall remain the
understandings of the Governments with respect to this Instrument, until such time as they
may agree otherwise.

If the foregoing is acceptable to your Government, the Embassy has the honor to
propose that this Note and your Note in reply shall constitute an agreement between our
two Governments, which shall enter into force on the date of entry into force of the
Instrument.

The Embassy avails itself of the opportunity to express to Her Majesty's Principal
Secretary of State for Foreign and Commonwealth Affairs the renewed assurance of its
highest consideration.

Embassy of the United States of America
London, England. December 16, 2004



The Consular Directorate of the Foreign and Commonwealth Office presents its compliments to the Embassy of the United States of America and has the honour to refer to the Embassy's Note No. 120 of 16 December 2004 which reads as follows:

"The Embassy of the United States of America at London, England, presents its compliments to Her Majesty's Principal Secretary of State for Foreign and Commonwealth Affairs and has the honour to refer to the Instrument as contemplated by Article 3(2) of the Agreement on Extradition between the United States of America and the European Union signed June 25, 2003, as to the application of the Extradition Treaty between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland signed March 31, 2003 (the "2003 Extradition Treaty").

Having been informed by the Government of the United Kingdom of Great Britain and Northern Ireland that it will be unable to apply Article 5(2) of the Agreement on Extradition between the United States of America and the European Union, as set forth in Article 9 of the Annex to the Instrument, relating to authentication of extradition documents, until a corresponding change is made in its domestic law governing extradition, the Embassy has the honour to propose on behalf of the United States Government as follows:

Article 5(2) of the Agreement on Extradition between the United States of America and the European Union, as set forth in Article 9 of the Annex to the Instrument, shall not be applied until the United States of America and the Government of Great Britain and Northern Ireland indicate in a subsequent exchange of notes that the required internal procedures have been completed. Until that time, the parties agree to apply the procedure for authentication of extradition documents set forth in Article 9 of the Extradition Treaty between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland signed March 31, 2003, upon its entry into force. The Government of the United Kingdom of Great Britain and Northern Ireland shall undertake to seek the necessary legislation at the earliest possible time.

The Embassy also wishes to confirm that two exchanges of letters related to the 2003 Extradition Treaty and done simultaneous with its signature shall remain the understandings of the Governments with respect to this Instrument, until such time as they may agree otherwise.

If the foregoing is acceptable to your Government, the Embassy has the honour to propose that this Note and your Note in reply shall constitute an agreement between our two Governments, which shall enter into force on the date of entry into force of the Instrument.

The Embassy avails itself of this opportunity to express to Her Majesty's Principal Secretary of State for Foreign and Commonwealth Affairs the renewed assurance of its highest consideration."

In reply, the Foreign and Commonwealth Office has the honour to confirm that the proposal set out in the Embassy's Note is acceptable to the Government of the United Kingdom of Great Britain and Northern Ireland and that the Embassy's Note, and this Reply, shall constitute an agreement between the two Governments which shall enter into force on the date of entry into force of the Instrument.

The Consular Directorate of the Foreign and Commonwealth Office avails itself of this opportunity to renew to the Embassy of the United States the assurances of its highest consideration.

London
16 December 2004

Note No. 50/10

The Foreign and Commonwealth Office presents its compliments to the Embassy of the United States of America and has the honour to refer to the Instrument as contemplated by Article 3(2) of the Agreement on Extradition between the European Union and the United States of America, signed on 25 June 2003, as to the application of the Extradition Treaty between the Government of the United Kingdom of Great Britain and Northern Ireland and the Government of the United States of America, signed on 31 March 2003.

Further to the Exchange of Notes to that Instrument, done at London on 16 December 2004, the Foreign and Commonwealth Office has the honour to confirm that the necessary domestic legislation is now in place to allow the Government of the United Kingdom of Great Britain and Northern Ireland to apply Article 5(2) of the Agreement on Extradition between the European Union and the United States of America, as set forth in Article 9 of the Annex of the Instrument, relating to the authentication of extradition documents.

The Foreign and Commonwealth Office avails itself of this opportunity to renew to the Embassy of the United States the assurances of its highest consideration.



Embassy of the United States of America
24 Grosvenor Square
London
W1A 1AE

20 October 2010

EMBASSY OF THE UNITED STATES OF AMERICA
LONDON

No. 108

The Embassy of the United States of America at London, England,
presents its compliments to Her Majesty's Principal Secretary of State for Foreign
and Commonwealth Affairs and has the honor to acknowledge receipt of
Diplomatic Note No. 30/10, dated October 20, 2010, from Her Majesty's Foreign
and Commonwealth Office which reads as follows:

"The Foreign and Commonwealth Office presents its compliments to the Embassy
of the United States of America and has the honour to refer to the Instrument as
contemplated by Article 3(2) of the Agreement on Extradition between the
European Union and the United States of America, signed on 25 June 2003, as to
the application of the Extradition Treaty between the Government of the United
Kingdom of Great Britain and Northern Ireland and the Government of the United
States of America, signed on 31 March 2003.

Further to the Exchange of Notes to that Instrument, done at London on 16
December 2004, the Foreign and Commonwealth Office has the honour to
confirm that the necessary domestic legislation is now in place to allow the
Government of the United Kingdom of Great Britain and Northern Ireland to

- 2 -

apply Article 5(2) of the Agreement on Extradition between the European Union and the United States of America, as set forth in Article 9 of the Annex of the Instrument, relating to the authentication of extradition documents.

The Foreign and Commonwealth Office avails itself of this opportunity to renew to the Embassy of the United States the assurances of its highest consideration."

On behalf of the United States Government, the Embassy has the honor to confirm that pursuant to the Foreign and Commonwealth Office's note and this Note in reply, Article 5(2) of the Agreement on Extradition between the United States and the European Union, as set forth in Article 9 of the Annex to the Instrument, applies between the two Governments as of the date of this note.

The Embassy avails itself of the opportunity to express to Her Majesty's Principal Secretary of State for Foreign and Commonwealth Affairs the renewed assurance of its highest consideration.

Embassy of the United States of America

London, England.  November 23, 2010





**British Embassy**
**Washington**

Embassy Note No:- 078/2024

**REQUEST FOR THE EXTRADITION OF THOMAS ROBERTSON FROM THE UNITED STATES OF AMERICA TO THE UNITED KINGDOM.**

His Britannic Majesty's Embassy presents its compliments to the Department of State and encloses documents in support of the extradition from the United States of America of Thomas Robertson to the United Kingdom.

His extradition is sought under the UK-US Extradition Treaty 2003, as amended, as a person accused of the following offences:

- Two counts of being concerned in the supplying of a Class A controlled drug namely Diamorphine and Cocaine to another in contravention of Section 4(3)(b) of the Misuse of Drugs Act 1971.

- Threatening and abusive behaviour, contrary to Section 38 of the Criminal Justice and Licensing (Scotland) Act 2010.

The Embassy would be grateful if the enclosed papers could be transmitted as soon as possible to the appropriate authorities with a request for the extradition of Thomas Robertson.

In the event of his return being ordered the Embassy would appreciate being notified as soon as possible so that arrangements can be made for his prompt return to the United Kingdom.

His Majesty's Embassy avails itself of this opportunity to express to the Department of State the renewed assurance of its highest consideration.



**British Embassy, Washington DC**

**12 July 2024**

C.

In forwarding the annexed papers, to be used in support of an application for the surrender from the United States of America to Scotland, United Kingdom, of Thomas Robertson who is accused of:

two counts of being concerned in the supplying of a Class A controlled drug namely Diamorphine and Cocaine to another contrary of Section 4(3)(b) of the Misuse of Drugs Act 1971; and

one count of threatening and abusive behaviour, contrary to Section 38 of the Criminal Justice and Licensing (Scotland) Act 2010.

I hereby certify that, to the best of my knowledge and belief, the signature on the documentations, is the signature of David Hall, Sheriff of the Sheriffdom of Tayside, Central and Fife, having authority to issue and receive the same. I further certify that such documents, signed by an officer having jurisdiction in the place where the same were issued or taken and authenticated by a Minister of State and sealed with his official seal, would be received in evidence for similar purposes by the tribunals in Great Britain.

Dated 2 July 2024

Signed

PC Badhan
Senior Extradition Caseworker
UK Central Authority

**<u>CERTIFICATE OF AUTHENTICATION</u>**

In the matter of the extradition of Thomas Robertson from the United States of America to the United Kingdom,

I, the Right Honourable Dorothy Bain KC, Lord Advocate, do hereby certify:

THAT attached to this Certificate is the authenticated documentation presented by the United Kingdom in support of the extradition of the said Thomas Robertson, a British national, born on 21 May 1998, who is accused in Scotland of: two charges of being concerned in the supply of controlled drugs, contrary to Section 4(3)(b) of the Misuse of Drugs Act 1971 and one charge of threatening and abusive behaviour, contrary to Section 38 of the Criminal Justice and Licensing (Scotland) Act 2010.

THAT the documentation attached to this Certificate is composed of:

- The original depositions of Jamie Hilland, Procurator Fiscal Depute and Police Sergeant Kris Robertson of the Police Service of Scotland, together with Annexes A – F.

- The original certificate of Sheriff David Hall of the Sheriffdom of Tayside, Central and Fife, dated 30th May 2024.

THAT Sheriff Hall, whose signature appears on the above-noted depositions, is a Sheriff of the Sheriffdom of Tayside, Central and Fife, having been duly appointed to that office, and as such is empowered to administer oaths and take depositions.

In my opinion the evidence in the foregoing depositions discloses sufficient evidence under the Law of Scotland that justifies the prosecution of the said Thomas Robertson for the charges outlined above.

Dorothy R. Bain.

Dorothy Bain K.C.
Lord Advocate

Edinburgh                                                                    19 June 2024

## SHERIFFDOM OF TAYSIDE, CENTRAL AND FIFE AT DUNFERMLINE

I, Sheriff David Hall, one of His Majesty's Sheriffs of Tayside, Central and Fife, hereby certify that the written and printed matter contained in the foregoing pages of paper are:

1. Deposition of Jamie Hilland, Procurator Fiscal Depute, together with Annexes A-F, said deposition and annexes being laid and sworn before me on 30th May 2024 at Dunfermline Sheriff Court

2. Deposition of Police Sergeant Kris Robertson of the Police Service of Scotland, together with Annexes A and F, said deposition and annexes being laid and sworn before me on 30th May 2024 at Dunfermline Sheriff Court

Given under my hand on this the 30th May 2024 at Dunfermline Sheriff Court

Sheriff of Tayside, Central and Fife at Dunfermline

DEPOSITION

## SHERIFFDOM OF TAYSIDE, CENTRAL AND FIFE AT DUNFERMLINE

At Dunfermline on the 30th day of May 2024.

In the presence of David Hall,

Sheriff of TAYSIDE, CENTRAL AND FIFE AT
DUNFERMLINE compeared Jamie Hilland, Procurator
Fiscal Depute who being examined on Oath deposes that
what is contained in the following statement is true.

STATES

I am a solicitor and a Prosecutor authorised by the Lord
Advocate to conduct criminal prosecutions in the Courts of
Scotland. I am familiar with the law of Scotland on criminal
matters.

This request is made in terms of the Extradition Treaty
between the United Kingdom and the United States of
America which entered into force on 31 March 2003 and is
the applicable law between the United States of America and
the United Kingdom of Great Britain and Northern Ireland.

**Sheriff of Tayside, Central and Fife**

Date: 30|5|24

**Procurator Fiscal Depute**

Date: 30 /5/24

Offences for which extradition is sought:

1. The surrender of THOMAS ROBERTSON, born 21
May 1998, is sought in respect of the following offences:

i)      between 19 April 2020 and 23 April 2020, both dates
inclusive, at 1 Rosemill Court, Newmills, Dunfermline, Fife
and elsewhere you LESLEY FREEGENT and THOMAS
ROBERTSON were concerned in the supplying of a
controlled drug, namely Diamorphine a Class A drug
specified in Part 1 of Schedule 2 to the Misuse of Drugs Act
1971 to another or others in contravention of Section 4(1) of
the aftermentioned Act; CONTRARY to the Misuse of
Drugs Act 1971, Section 4(3)(b);

ii)     between 19 April 2020 and 23 April 2020, both dates
inclusive, at 1 Rosemill Court, Newmills, Dunfermline, Fife
and elsewhere you LESLEY FREEGENT and THOMAS
ROBERTSON were concerned in the supplying of a
controlled drug, namely Cocaine a Class A drug specified in
Part 1 of Schedule 2 to the Misuse of Drugs Act 1971 to
another or others in contravention of Section 4(1) of the
aftermentioned Act; CONTRARY to the Misuse of Drugs
Act 1971, Section 4(3)(b);

iii)    on 26 April 2020 at 1 Rosemill Court, Newmills,
Dunfermline, Fife you LESLEY FREEGENT and THOMAS
ROBERTSON did behave in a threatening or abusive
manner which was likely to cause a reasonable person to
suffer fear or alarm in that you did shout and utter threats of

DAW Hay

**Sheriff of Tayside, Central and Fife**

Date: 30|5|24

**Procurator Fiscal Depute**

Date: 30/5/24

violence towards Pamela Stirling, c/o the Police Service of Scotland, repeatedly demand money from her and threaten to burn down her house unless she paid you said money; CONTRARY to Section 38(1) of the Criminal Justice and Licensing (Scotland) Act 2010.

### Decision on which the Extradition Request is based

2.  Warrant for the apprehension of THOMAS ROBERTSON issued by the Sheriffdom of TAYSIDE, CENTRAL AND FIFE AT DUNFERMLINE on 4 May 2022 under section 102A of the Criminal Procedure (Scotland) Act 1995, the accused THOMAS ROBERTSON, having failed to attend court to face charges on indictment for: two charges of being concerned in the supplying of controlled drugs, contrary to the Misuse of Drugs Act 1971, Section 4(3)(b) and threatening and abusive behaviour, contrary to the Criminal Justice and Licensing (Scotland) Act 2010, Section 38.

3.  These are extradition offences, and the extradition of THOMAS ROBERTSON is sought to Scotland in respect of these offences. The charges of being concerned in the supplying of Class A drugs, namely Diamorphine and Cocaine; and threatening and abusive behaviour are set out in the certified copy apprehension warrant, annexed at **Annex A** and the indictment at **Annex B**.

Sheriff of Tayside, Central and Fife

Date: 30/5/24

Procurator Fiscal Depute

Date: 30/5/24

## RELEVANT LAW

4.  Scotland is a separate jurisdiction within the United
    Kingdom. The criminal law of Scotland is separate and
    distinct from that of England and Wales. Scotland does
    not have a penal code. Criminal offences can be offences
    under the common law or under statute. Common law is
    an unwritten law, based on custom and usage and
    developed by case law of the court. The development by
    case law is known as the doctrine of precedent, whereby
    the decisions of the higher courts are binding on the
    lower courts. Some offences are also criminalised under
    statute. All of the crimes as set out in the arrest warrant
    for THOMAS ROBERTSON are statutory offences
    contained within statutory provisions of the law of
    Scotland.

### Offences 1 and 2: Being concerned in the supplying of a controlled drug to another

5.  It is an offence to be concerned in the supplying of a
    controlled drug to another in contravention of Section
    4(1) of the Misuse of Drugs Act 1971. Being 'concerned'
    in the supply does not require a completed supply to
    person but may take the form of knowing the nature of
    the enterprise, i.e that it involved supply of a drug or such
    things as offering to supply a drug. This offence will be
    libelled as a charge under Section 4(3)(b) of the Misuse

DlW Ham

**Sheriff of Tayside, Central and Fife**

Date: 30/5/24

**Procurator Fiscal Depute**

Date: 30/5/24

of Drugs Act 1971. **A copy of said section is attached at Annex C.**

6. The maximum penalty that may be imposed following a conviction in Scotland on indictment for the crime of being concerned in the supplying of a **Class A** drug contrary to Section 4(3)(b) of the Misuse of Drugs Act 1971 is life imprisonment, as per Schedule 4 of said Act.

7. This case concerns Diamorphine and Cocaine, both of which are controlled substances in terms of Schedule 2 of the Misuse of Drugs Act 1971. They are both Class A controlled substances. **A copy of said schedule is attached at Annex D.**

**Offence 3: Threatening and abusive behaviour**

8. It is an offence to behave in a threatening or abusive manner. The behaviour must be likely to cause fear or alarm to a reasonable person. It also must have been intended to cause fear and alarm or the perpetrator must have been reckless as to whether the behaviour would cause fear and alarm. The behaviour can consist of a single act or a course of conduct. This offence will be libelled as a charge under Section 38 of the Criminal Justice and Licensing (Scotland) Act 2010. **A copy of said section is attached at Annex E.**

9. The maximum penalty that may be imposed following a conviction in Scotland on indictment for the crime of threatening and abusive behaviour, contrary to the

_Sheriff of Tayside, Central and Fife_

Date: 30/5/24

Procurator Fiscal Depute

Date: 30/5/24

Criminal Justice and Licensing (Scotland) Act 2010,
Section 38, is 5 years imprisonment.

### Solemn procedure of THOMAS ROBERTSON

10. Solemn procedure in Scotland means proceedings before
a sheriff and jury or before a High Court judge and jury.
Proceedings for the most serious offences will
be conducted in the High Court.

11. The document which sets out details of the charges
against the accused person and which is served on the
accused is the indictment in trial proceedings and the
petition in committal proceedings. A petition is the
initial writ in solemn criminal jurisdiction, whether in the
High Court or the Sheriff Court. The petition is presented
to a Sheriff. The petition sets out the name, designation
and address of the accused person; states the criminal
charges against him; and asks the Sheriff to grant a
warrant for the apprehension of the accused person. The
petition is the first stage in a prosecution and marks the
point where the Prosecutor is satisfied that the
information and evidence collected during the
investigation by the police is sufficient to justify
bringing an accused person to court to be prosecuted,
notwithstanding that further preparation of the case by
the prosecutor will take place prior to the case being
indicted for trial.

Sheriff of Tayside, Central and Fife

Date: 30/5/24

Procurator Fiscal Depute

Date: 30/5/24

12. The competent Judge in committal proceedings is the Sheriff. The Procurator Fiscal is the public prosecutor responsible *inter alia* for conducting committal proceedings in the Sheriff Court. All criminal proceedings on indictment proceed on the authority and in the name of the Lord Advocate.

13. The crimes of being concerned in supplying a Class A drug (Diamorphine and Cocaine), contrary to Section 4(3)(b) of the Misuse of Drugs Act 1971 and threatening and abusive behaviour, contrary to the Criminal Justice and Licensing (Scotland) Act 2010, Section 38, may be tried on indictment in Scotland.

14. The case against THOMAS ROBERTSON will proceed in the Sheriff Court, before a Sheriff and Jury. The maximum sentence that can be passed in a Sheriff and Jury court is **5 years imprisonment**. That is due to the different sentencing powers of the court in Scotland. Therefore, whilst two of the crimes in the case carry a maximum life sentence, in practice, a life sentence could only be imposed if the case proceeded in the High Court, which this case is not.

15. The case against THOMAS ROBERTSON was reported to the Procurator Fiscal's office by the Police Service of Scotland on 27 April 2020. The report indicated that at that time Thomas Robertson lived at 18 Broomhill Gate, Glasgow, G11 7NU.


Sheriff of Tayside, Central and Fife

Date: 30/5/24

Procurator Fiscal Depute

Date: 30/5/24

16. The petition arrest warrant was requested by the Procurator Fiscal and signed by the Sheriff on 27 April 2020. The accused was brought before the court from custody on this date and was committed for further examination. The Prosecutor was opposed to THOMAS ROBERTSON being released on bail however he was released on bail to a bail address of 18 Broomhill Gate, Glasgow, G11 7NU. THOMAS ROBERTSON was thereafter indicted to attend at Dunfermline Sheriff Court Hearing on 13 April 2021. After this date, there were a number of procedural hearings to ensure that both parties were ready for trial. The accused plead not guilty and a trial was fixed for 3 May 2022. On 3 May 2022, THOMAS ROBERTSON failed to appear for his trial. On that basis, a warrant was sought by the Prosecutor in court on this date and granted by Sheriff S Duff, Sheriff of Tayside, Central and Fife at Dunfermline in terms of section 102A of the Criminal Procedure (Scotland) Act 1995. This warrant for the accused remains extant and valid throughout the United Kingdom.

Productions:    Annexes A and B - include; a copy indictment for THOMAS ROBERTSON and certified court minute including the warrant for the apprehension of THOMAS ROBERTSON granted by Sheriff S Duff at Dunfermline Sheriff Court on 4 May 2022 certified by the Sheriff Clerk Depute at Dunfermline Sheriff Court, who is an officer of the Sheriff Court competent to certify such documents.

DU WHAM

**Sheriff of Tayside, Central and Fife**

Date: 30/5/24

**Procurator Fiscal Depute**

Date: 30/5/24

17. On his return to the United Kingdom, THOMAS ROBERTSON will appear in the Sheriffdom of Tayside, Central and Fife at Dunfermline on the section 102A warrant for apprehension. He shall be entitled immediately, on being brought before Sheriff Court at Dunfermline to apply for bail. Having previously appeared on the petition and having already been indicted in relation to this matter, THOMAS ROBERTSON will be re-indicted for trial before a Sheriff and Jury on the charges aforementioned. If he is remanded in custody then the indictment must ordinarily be served within 80 days of the full committal hearing and the trial must commence within 140 days. If he is released on bail, then the indictment will be served on him and the trial must ordinarily begin within one year of his first appearance in court. These periods can only be extended if the Sheriff is satisfied that cause has been shown for doing so.

18. At present, the above-noted time limits are subject to extension under the Coronavirus (Recovery and Reform) (Scotland) Act 2022.

19. The effect of this legislation is that, currently, if an accused person is granted bail, a First Diet (a procedural hearing) must commence within 17 months of his first appearance before the Sheriff. The trial must commence within 18 months of the accused's appearance before the Sheriff. It remains the case that these periods can only be extended if a Sheriff is satisfied that cause has been

Sheriff of Tayside, Central and Fife

Date: 30/5/24

Procurator Fiscal Depute

Date: 30/5/24

shown for doing so. The time limits specified in this paragraph do not apply where a warrant has been granted in terms of section 102A of the Criminal Procedure (Scotland) Act 1995, and an accused person is subsequently granted bail.

20. If the accused is remanded in custody, when he appears in court to answer the warrant, then the indictment must be served upon him within 260 days of the date on which he is remanded in custody. The First Diet must commence within 290 days and the trial must commence within 320 days. If these time limits are not met, the accused will be entitled to be admitted to bail, unless a Sheriff is satisfied that cause has been shown to extend the periods referred to.

21. If the Coronavirus (Recovery and Reform) (Scotland) Act 2022 is still in force at the time of the requested person's surrender to Scotland, he would be subject to the time limits contained therein.

22. In the event of the said THOMAS ROBERTSON being returned to Scotland, his prosecution for the said crimes for which extradition is requested will not have become time-barred by lapse of time according to the law of Scotland. No statute of limitation applies to offences tried on indictment. There is no concept of the "interruption of time limits" in Scots law.

23. As noted above, Scotland and England are separate legal jurisdictions within the United Kingdom.

**Sheriff of Tayside, Central and Fife**

Date: 30/5/24

**Procurator Fiscal Depute**

Date: 30/5/24

24. The case against THOMAS ROBERTSON is based on the statements of witnesses with knowledge of his involvement in the criminal conduct which he is alleged to have committed.

25. The identification of the accused THOMAS ROBERTSON will be proved during the trial in Scotland by dock identification by the witnesses in the case who can identify THOMAS ROBERTSON as the perpetrator of the offences. Dock identification is when the witnesses in the case are asked to identify the accused person in court in the course of giving evidence during the trial.

26. Once proceedings have been commenced, the usual procedure is to hold an identification parade. This is done by taking video "clippings" of the suspects and then, at a later date, showing a video compilation to the witnesses which contains the video clips of the suspects and a number of "stand-ins" (similar-looking individuals). The accused THOMAS ROBERTSON and co-accused Freegent failed to appear for their video clippings, so identification parades have not been possible in this case.

27. A photograph of the accused is provided at **Annex F** of the extradition request. Police Constable Dale Clark and Police Constable Laurie Hanlon can identify the individual in the photograph at **Annex F** as one of the individuals who they arrested at Rosemill Court, Newmills, known as Thomas Robertson. Sufficient

**Sheriff of Tayside, Central and Fife**

Date: 30/5/24

**Procurator Fiscal Depute**

Date: 30/5/24

evidence currently exists under Scots law to establish
that the man named as THOMAS ROBERTSON, born
21 May 1998 - who is shown in the attached photograph,
is the same individual responsible for the offences in the
indictment attached at **Annex B.**

28. The Scottish authorities have been unable to detain
THOMAS ROBERTSON because he has absconded to
the United States of America before trial and it is
believed he has no intention to return voluntarily to
Scotland to face the crimes he is accused of. Intelligence
provided suggests he is presently residing in
Pennsylvania. His current address is thought to be 249
Reunion Ridge, East Stroudsburg, Pennsylvania, USA,
PA18301.

29. The circumstances described in the deposition of Police
Sergeant Kris Robertson would, if proved, entitle a
criminal court in Scotland to convict the said THOMAS
ROBERTSON of all of the crimes of being concerned in
the supplying of a controlled drug, namely Diamorphine
and Cocaine, contrary to the Misuse of Drugs Act 1971,
Section 4(3)(b) and threatening and abusive behaviour,
contrary to the Criminal Justice and Licencing
(Scotland) Act 2010, Section 38.

30. The Sheriff is by the law of Scotland a Judge before
whom a deposition may be sworn and who is competent
to certify documents and copies thereof for the purpose
of extradition proceedings.

31. I swear that the foregoing deposition is true.

Sheriff of Tayside, Central and Fife

Date: 30/5/24

Procurator Fiscal Depute

Date: 30/5/24

DEPOSITION

**SHERIFFDOM OF TAYSIDE, CENTRAL AND FIFE AT DUNFERMLINE**

At Dunfermline on the 30th day of May 2024

In the presence of David Hall,

Sheriff of TAYSIDE, CENTRAL AND FIFE AT DUNFERMLINE
compeared Police Sergeant Kris Robertson, who being examined on
oath depones that what is contained in the following statement is
information provided to him in the course of the police investigation.

STATES

1.  I am 42 years of age and have completed 17 years Police service. I
    am a Police Sergeant.

2.  I am the Reporting Officer in the case against Thomas Robertson,
    born 21 May 1998 ("the accused"). It is the function of the reporting
    officer to gather all available evidence, take statements from
    witnesses, collect productions and make a report to the appropriate
    Procurator Fiscal, which in this case is the Procurator Fiscal at
    Dunfermline.

**Sheriff of Tayside, Central and Fife at Dunfermline**
Date: 30 | 5 | 24

**Police Sergeant Kris Robertson**
Date: 30/5/24

3. This case involves three charges as described in the attached sworn deposition by the Procurator Fiscal Depute Jamie Hilland. All charges are statutory offences. The first and second charges are offences contrary to the Misuse of Drugs Act 1971. The third charge is an offence contrary to Section 38 of the Criminal Justice and Licensing (Scotland) Act 2010 and are all included in the certified copy apprehension warrant, attached at **Annex A.** In relation to all of the charges, the accused Robertson has a co-accused, Lesley Freegent.

4. The accused Robertson is 25 years of age (date of birth 21 May 1998). He is a British National. He is described as being of white ethnic origin with short blonde hair. A certified photograph of the accused is included at **Annex F**. His last known address in the United Kingdom is 18 Broomhill Gate, Glasgow, G11 7NU. In September 2021, the accused left Glasgow. Intelligence suggests that he then moved around Europe, spending time in Spain and the Netherlands. In May 2023, he left for South America and intelligence has confirmed he entered the United States on 11 May 2023 via the land border at San Diego. Current intelligence places the accused Robertson in Pennsylvania. His current address is thought to be 249 Reunion Ridge, East Stroudsburg, Pennsylvania, USA, PA18301.

5. I was tasked to be the reporting officer for the case against accused Robertson, to take statements from witnesses, interview the accused and ingather evidence such as written notes, screenshots and reports.

Sheriff of Tayside, Central and Fife at Dunfermline
Date: 30/ 5 /24

Police Sergeant Kris Robertson
Date:
30/5/24

## DESCRIPTION OF INCIDENT

6. By way of background, witnesses Pamela Stirling and James Campbell are in a relationship and resided together at 1 Rosemill Court, Newmills, Dunfermline, where these offences took place. Both are self-admitted users of diamorphine and crack cocaine and would regularly purchase drugs from a male named "Johnny" from High Valleyfield in Dunfermline. The individual known as "Johnny" has not been identified or yet located.

7. At around 2:00pm on 19 April 2020 witnesses Campbell and Stirling were within 1 Rosemill Court, Newmills together when "Johnny" attended unannounced. "Johnny" was in the company of two males, both of whom spoke with Glaswegian accents. These males were accused Robertson and his co-accused Freegent. The two men provided aliases – "Reece" and "Sam" respectively. Stirling provided the following information in her police statement: "Johnny was with 2 males, who I've never met before. They both had Glasgow accents and one guy was black while the other was white. The white guy told us his name was Reece and he was 26 years old. He was 6ft or slightly taller and medium build. He had short blond hair that was slightly longer at the front. He had really white teeth and spoke with a speech impediment". Campbell provided the following information in his police statement: "Reece is white skinned, about 5ft 10 inches, slim build, around 20-25 years old, short light brown/black hair. He speaks with a Glasgow accent and has a lisp when he speaks". He goes on to describe "Sam" as being "black skinned", shorter than Reece and short black hair (consistent with Stirling's description of the other male present).

D I W Ham

Sheriff of Tayside, Central and Fife at Dunfermline
Date: 30 / 5 / 24

Police Sergeant Kris Robertson
Date: 30/5/24

8.  Both Stirling and Campbell describe the two men with some minor
    discrepancies in their descriptions, and it is clear which alias is being
    used by accused Robertson and his co-accused Freegent. The
    description of 'Reece' matches the description of accused
    Robertson. Moreover, the individual who identified himself as
    'Reece' to Stirling and Campbell, identified himself upon arrival at
    the Dunfermline Police Station on April 26, 2020, at 6:44 pm as
    Thomas Robertson a British national born on 21 May 1998.
    Therefore, when Stirling and Campbell refer to 'Reece', they are
    referring to accused Robertson.

9.  According to Campbell's statement to the police, "Johnny"
    informed Stirling and Campbell that the two males, accused
    Roberston and his co-accused Freegent, could set them up dealing
    drugs and advised that they could obtain any type of drug. In this
    context, the implication is that the two men could obtain any type of
    drug and supply it to the two witnesses on tick for them to sell on.
    The phrase "on tick" means that the dealer (in this case, accused
    Robertson and his co-accused Freegent) does not take any money
    from the sub-dealer (in this case the sub-dealers were Stirling and
    Campbell) at the point of supplying the drug to them, but it is paid
    back later. In this case, it would be paid back once the drugs have
    been sold on by the sub-dealers.

10. According to Campbell's statement to the police, Campbell and
    Stirling requested a small amount of crack cocaine (Campbell
    estimated approximately a half gram to a gram) from accused
    Robertson and co-accused Freegent for their own consumption.
    According to Campbell, whilst within the locus accused Robertson

Sheriff of Tayside, Central and Fife at Dunfermline
Date: 30/5/24

Police Sergeant Kris Robertson
Date: 30/5/24

told Campbell that he had a car outside and then showed him the
vehicle. Robertson stated that it was his friend's car. Campbell then
left the house to attend at his mother's address, leaving Stirling alone
with accused Robertson and co-accused Freegent. They both
remained at the property for a short while whilst they waited to be
collected and left shortly after.

11. According to Stirling's statement to the police, within an hour of
    them leaving, on the same day, accused Robertson and co-accused
    Freegent returned to 1 Rosemill Court, Newmills and provided
    Stirling with a large quantity of diamorphine (around 9 ounces).
    They instructed her to sell it on their behalf. According to Stirling,
    the men gave her the drugs, told her she had to sell it for them and
    that they would be back. There is no suggestion that specific
    instructions were given, or a timeline provided in relation to when
    the drugs were to be sold by or the money provided.

12. Stirling stated that accused Robertson left his mobile telephone
    number with Stirling and the keys for the red Mercedes car which
    was parked close to the property. He informed her that it would be
    collected in the morning. A mobile phone was seized from accused
    Robertson which was examined by the Police. The examination
    revealed that Robertson's phone has Stirling's number saved on the
    device.

13. At around 5:00pm, on the same day, Campbell says in his statement
    to the police, that he received a telephone call from Stirling
    informing him of the substantial amount of drugs dropped off by
    accused Robertson and co-accused Freegent. He then returned to the

Sheriff of Tayside, Central and Fife at Dunfermline
Date: 30/5/24

Police Sergeant Kris Robertson
Date:

property. Stirling advised Campbell that accused Robertson and co-accused Freegent had instructed them to sell the drugs.

14. On the morning of 20 April 2020, accused Robertson telephoned Stirling and requested that she pay £1000 for the drugs. Stirling's account is that the request for £1,000 was not a full and final settlement. Her account is that she was told later that day by "Reece" (accused Robertson) that the heroin was worth £3,000, and the further £800 (see paragraph 17) for the crack cocaine was added to this total, without deducting the £650 they go on to pay him that morning. The impression from Stirling's account is that she was not explicitly told what would be due at what time - accused Robertson just kept contacting her to demand money from her.

15. Accused Robertson instructed her to leave the money in the Mercedes car, which he advised was going to be picked up later that day. Stirling says that she placed £650 in money, previously withdrawn from her bank account, into the car.

16. Stirling and Campbell's account is that they were first introduced to "Reece" and "Sam" (accused Robertson and co-accused Freegent) on 19 April 2020. The Police became involved on 26 April 2020. Stirling stated the following in relation to Monday 20 April 2020): "I'd just been paid so both James (Campbell) and I were able to get £600. I get paid monthly, into my bank account, on 17 April 2020. I had been given £700 so I had the £650 left over." The bank statement shows a withdrawal of £300 on 17 April 2020. The bank statement for Stirling shows withdrawals of £168 on 20 April 2023. Further, the bank statement also shows £200 on 21 April 2020 and a withdrawal of £250 on 22 April 2020. Stirling did not specify that

Sheriff of Tayside, Central and Fife at Dunfermline
Date: 30/5/24

Police Sergeant Kris Robertson
Date: 30/5/24

all of the money came from her account: she stated: "James (Campbell) and I were able to get the £600".

17. According to Stirling's statement to the police, at 10:30am, a recovery truck arrived and uplifted the Mercedes car. Stirling informed the driver, who remains unidentified, that the money was in the glove box. According to the statement provided by a neighbour named June Cocco, she was aware of a red Mercedes car being uplifted by a recovery truck and observed Stirling informing the male driver that "the money is in the glove box".

18. Stirling told police in her statement to them that at 5:00pm, accused Robertson attended at the locus and delivered half an ounce of crack cocaine. He instructed Stirling to sell it and stated that Stirling and Campbell owed him a further £800. When Campbell returned to the property, he saw the heroin (diamorphine) and the crack cocaine. That night, Stirling and Campbell consumed the crack cocaine delivered that day themselves.

19. According to Stirling's statement to police, over the following days, Stirling continued to receive calls from the accused Robertson, known to her as "Reece", asking for increasing amounts of money from her and Campbell. According to Campbell's statement to police, Campbell was aware of the calls received by Stirling from accused Robertson, however was not aware what was said during these. Stirling has not provided a specific account to police of what was said during these calls. The account given by Stirling is that "over the following days we continued to get calls off Reece who was asking us for more and more money. He never threatened us on the calls but both James and I were still scared".

Sheriff of Tayside, Central and Fife at Dunfermline
Date: 30/5/24

Police Sergeant Kris Robertson
Date: 30/5/24

20. According to Stirling's statement to the police, on 23 April 2020, accused Robertson attended at the locus with 52 grams of crack cocaine and Stirling provided him with £400, which she had previously withdrawn from her bank account. Accused Robertson informed Stirling that she and Campbell still owed him £5900. In Campbell's statement to police, he said that Stirling later told Campbell, who had been at his mother's address at the time, about the money she had paid to the accused Robertson.

21. According to Campbell's statement to the police, on 24 April 2020, at around 11:30am, Stirling and Campbell were at home at 1 Rosemill Court, Newmills, when the accused Roberson attended to collect more money. Campbell requested that the accused Robertson give him a lift to a local ATM in order to withdraw money. The accused Robertson then travelled to an ATM with Campbell in a grey Audi car driven by female whose identity remains unknown. Upon arrival at the ATM, Campbell discovered he did not have enough money in his account. Campbell then requested to be taken to his mother's address. After that, Campbell and the accused returned to 1 Rosemill Court, Newmills. Accused Robertson informed him that he would speak to Stirling and arrange to collect the outstanding money. Stirling describes accused Robertson as "just chatting away" (having an innocuous conversation).

22. Stirling stated to the police that she paid accused Robertson a further £400 on this date. That night, Stirling received a number of telephone calls from accused Robertson in which he demanded that she pay him £1000 the following day.

Sheriff of Tayside, Central and Fife at Dunfermline
Date: 30/5/24

Police Sergeant Kris Robertson
Date: 30/5/24

23. According to Stirling's statement to the police, on 26 April 2020, at 12:00pm, accused Robertson telephoned Stirling and demanded that she pay him £2000, informing her that he would attend at her home at 3:00pm. According to Campbell's statement to the police, at 2:00pm, he left the house to go and visit his mother, leaving Stirling alone within. Nicola Henderson, a friend of Stirling provided a statement to police. She stated that at around 2:30pm she attended at the property and found Stirling within, alone and upset. At the same time, accused Robertson arrived at the property. According to Stirling's statement to the police, as she was unable to pay him any money this time, accused Robertson began shouting at her, threatening to burn her house down with both Stirling and Campbell within and shouting that he would return with the accused Freegent. Stirling later stated the following to the police about accused Robertson: "shouting...telling us that he's going to burn the house down with me and James in it". Accused Robertson then left the property.

24. According to Campbell's statement to the police, Stirling then telephoned Campbell and told him about the threats received from accused Robertson and his demands for money. Campbell attended at his sister's address in order to source money and returned home with £300 which he gave to Stirling. Campbell then left again in order to source more money to pay accused Robertson and co-accused Freegent. According to Stirling's statement to the police, at around 3:20pm, accused Robertson returned to 1 Rosemill Court, Newmills, along with co-accused Freegent. On their arrival, accused Robertson and co-accused Freegent shouted at Stirling and demanded money. In her statement to police, Stirling says that Robertson and Freegent were threatening that, if she failed to pay

Sheriff of Tayside, Central and Fife at Dunfermline
Date: 30/5/24

Police Sergeant Kris Robertson
Date: 30/5/24

them, they would put her in a "life threatening situation". She also
stated that she was terrified and crying. The prosecution case in
relation to the "threatening or abusive behaviour" charge is that the
conduct (shouting, telling her to get their money, saying that they
would put her in a "life-threatening situation") is inherently
threatening.

25. According to Campbell's statement to the police, whilst within the
property, Stirling phoned Campbell to tell him what was happening
and informed him that accused Robertson and co-accused Freegent
were refusing to leave until they had been paid the monies owed.
Campbell describes Stirling as being "really upset, she sounded
petrified she was crying her eyes out". He told her to telephone the
police. According to Stirling's statement to the police, she informed
accused Robertson and co-accused Freegent that she would source
cannabis for them, and she later left the property.

26. At this time, Stirling's friend Nicola Henderson was walking past 1
Rosemill Court, Newmills, and observed Stirling standing in the
street nearby. In her statement to the police, she describes Stirling
as being "hysterical and crying" and indicating that two males were
within her address, and she was terrified to go back there. A
neighbour also observed Stirling standing out in the street. In the
neighbour's statement to the police, they describe Stirling as being

Sheriff of Tayside, Central and Fife at Dunfermline
Date:    30/5/24

Police Sergeant Kris Robertson
Date:    30/5/24

in a hysterical state and speaking on a mobile telephone. Stirling then reported the matter to the police.

**Police Involvement**

27. At 6:00pm, officers of the Police Service of Scotland arrived at 1 Rosemill Court, Newmills, and forced entry as the door was locked. Accused Robertson and co-accused Freegent were found within the property. At 6:44pm, officers arrested accused Robertson and he was taken to Dunfermline Police Station. On being taken into custody, suspects are required to give their name, date of birth, address and nationality. Robertson identified himself as Thomas Robertson with the date of birth and nationality as listed in paragraph 4 above. This has been recorded in the Arrest Form. Accused Robertson has previous convictions and a photograph on the Police database from 2019, which showed the same man as was arrested on 26 April 2020.

28. Officers located Stirling standing a short distance from 1 Rosemill Court, Newmills. She was speaking on her mobile telephone and appeared to be upset. Stirling informed the officers that she had made excuses to buy cannabis for the males in order to leave. Police Constable Dale Clark, who attended the incident, stated that he has known Stirling for many years (as a local drug user) and stated that she "is normally quite a hardnosed individual but on this occasion her fear of both accused was apparent". He says that she was

Sheriff of Tayside, Central and Fife at Dunfermline
Date: 30/5/24

Police Sergeant Kris Robertson
Date:

"petrified in her appearance and manner" and was "howling in tears which I have never seen her like before."

29. Officers then accompanied Stirling to the property and noted her statement. They then seized her mobile phone. Stirling then directed officers to a polythene bag within a kitchen cupboard, which she advised was heroin initially given to her by accused Robertson and co-accused Freegent. This was seized as evidence. Officers then traced Campbell at a separate address and noted his statement.

30. The account provided in this statement is based upon the statements provided by Stirling and Campbell to the police.

<u>Analysis of the items seized from 1 Rosemill Court, Newmills</u>

31. The following items were seized from the property at 1 Rosemill Court, Newmills and sent for analysis:
    - Bag of brown powder (contained in the polyethene bag that Stirling directed Officers to)
    - Mobile phone belonging to Stirling

    The mobile phones belonging to accused Robertson and co-accused Freegent were also seized when they were arrested.

<u>Analysis of Drugs Seized</u>

32. The bag of brown powder was examined and found to be a carrier and containing two pieces of place and a quantity of brown powder. On analysis the brown powder was found to be diamorphine weighing 166.78 grams.

Sheriff of Tayside, Central and Fife at Dunfermline
Date: 30/3/24

Police Sergeant Kris Robertson
Date: 39/5/24

33. Detective Sergeant Plank and Detective Constable Gordon are both
    Police Officers who work in the Drug Expert Witness Unit. Their
    role is to provide impartial statements of opinion in relation to
    alleged drug dealing cases. This involves examination of the case
    prior to preparing and submitting a report. This report is based on
    their assessment of the evidence and whether or not they consider
    the case to involve drug dealing. They assess each case objectively
    and will not support a drug dealing prosecution unless they are
    satisfied the charges are competent. They have reviewed the
    evidence and drug analysis in this case. They are of the opinion that
    the 166.78 grams of diamorphine is just short of six ounces of the
    drug. If sold in '0.5 gram deals' at £25 each, this would have the
    potential street value of £8,325. This would be considered an
    amount of drugs which indicates supply of said drugs to others.
    Stirling stated that she had initially been given nine ounces by the
    accused. That would mean that at least a further three ounces, with
    a value of £2700 had already been supplied or used.

34. Detective Sergeant Plank and Detective Constable Gordon are of the
    opinion that if the statements of Stirling and Campbell are accurate
    then the evidence would indicate that both accused were involved in
    the supply of diamorphine and crack cocaine.

### Cybercrime Evidence

35. The mobile phone belonging to Stirling was examined. A number of
    messages were recovered indicating that Stirling and Campbell were
    involved in the supply of controlled drugs and in debt to their

Sheriff of Tayside, Central and Fife at Dunfermline
Date: 30/5/24

Police Sergeant Kris Robertson
Date: 30/5/24

supplier. The messages would be led as circumstantial evidence in support of the allegation that Stirling was being pressured for money by another person (the prosecution's point being: why else would she be sending these messages otherwise?). It is not alleged that any of the messages are criminal.

36. The first message of significance was a message sent at 2:04pm on 26 April 2020 to "Niknak". The message stated: "THIS WEE DIK IS FUKKN DEMANDIN 1400 NOW BY HAF 3! AM FKN SIK OF IT NIK FKN WANKA LIKE". This was sent by Stirling to an unknown third party. This translates as: "this wee dick is fucking demanding 1400 now by half 3! Am fucking sick of it Nik, fucking wanker like". She is calling him a dick (pejorative term, derived from slang for penis), and a wanker (insult derived from a slang term for male masturbation).

37. Detective Sergeant Plank and Detective Constable Gordon are of the opinion that this message means that Stirling is being asked to repay £1400 by 3:30pm that day.

38. The second message of significance was a message sent from Stirling's phone at 2:17pm on 26 April 2020 to "Ma Jimjam". "Ma Jimjam" is suspected to be Campbell. The message stated: "NEED TO FIND 300 OR HE WANTS IT AW BAK FUKKN HUMPT AGAIN AND NO GOT W 2 GIE HIM BAK SO COURSE AM FREAKIN OUT". This translates as: "Need to find £300 or he wants it all back. Fucking humped [screwed] again. And I do not have w [cocaine] to give him back so of course I am freaking out".

Sheriff of Tayside, Central and Fife at Dunfermline
Date: 30/5/24

Police Sergeant Kris Robertson
Date: 30/5/24

Sergeant Plank and Detective Constable Gordon are of the opinion that this message means that Stirling is being asked to pay £300 or have to return all the drugs that have been received. It is also their opinion that this message means they no longer had the drugs, as 'W' is a slang term for cocaine.

39. A message conversation also took place with 'Babygal'. There are two messages of significance in that conversation from 26 April 2020. The first was sent from Stirling's phone at 7:10pm.. It stated: AM SO SORRY HEN THESE WILL COME LOOKIN FOR ALL MY FAMILY AS WELL I NEED 900 TO GET THEM AWAY THE NITE AND WE ALL NEED TO GO IN2 HIDING AM SERIOUS ASK MY DAD 2 FONE ME PLEASE". This translates as: "I'm so sorry hen [term of endearment for a female friend] these will come looking for all my family as well. I need £900 to get them away tonight and we will all need to go into hiding. I'm serious. Ask my dad to phone me, please".

40. The second message was received at 7:13pm. It stated: "YOU'RE A FUCKING IDIOT I SWEAR TO FUCKING GOD AL JUST PHONE THE POLICE YOUR IDIOT DEBT FOR DRUGS AM GOING THROUGH ENOUGH". This message translates as: "You're a fucking idiot I swear to fucking god, I'll phone the Police. Your idiot debt for drugs (?), I'm going through enough". Detective Sergeant Plank and Detective Constable Gordon are of the opinion that these messages confirm that Stirling was still under serious threat to repay the drugs debt at the time they were sent and that she was still required to find £900 that evening.

R W Hall
**Sheriff of Tayside, Central and Fife at Dunfermline**
Date: 30/5/24

Police Sergeant Kris Robertson
Date: 30/5/24

41. These messages support Stirling's account that she was supplying
drugs for persons whom she owed money to, however neither
accused are named in the messages.

## Evidence against THOMAS ROBERTSON

42. Stirling and Campbell both say that accused Robertson has provided
them with heroin (diamorphine) and crack cocaine to sell on and
then asked for money from them. Stirling stated that "Johnny" came
to the house with accused Robertson and co-accused Freegent on 19
April 2020, which was their first meeting.. "Reece" and "Sam"
(accused Robertson and co-accused Freegent) supplied a small
amount of heroin (diamorphine), and then came back with a larger
amount (nine ounces). The following day, 20 April 2020 at around
5pm, accused Robertson returned, gave them around half an ounce
of crack cocaine and told them to sell it. Campbell describes
"Johnny" coming to the house with accused Robertson and co-
accused Freegent on 19 April 2020. "Johnny" told them that accused
Robertson and co-accused Freegent could set them up dealing drugs
and were able to obtain any kind of drug. Campbell and Stirling
asked them to get a small amount of crack cocaine. Campbell left
the house. A couple of hours later, Stirling made him aware that the
accused had delivered the drugs. He went back to the house and saw
about nine ounces of heroin (diamorphine) and about an ounces of
crack cocaine.

43. There is evidence that the accused attended at the house on various
occasions in order to collect the drug debt. Stirling phoned the police
saying that two males were in her house demanding money from

Sheriff of Tayside, Central and Fife at Dunfermline
Date: 30/5/24

Police Sergeant Kris Robertson
Date: 30/5/24

her. The Police attended and accused Robertson was found within the house. Stirling was found in a distressed state. A package that Stirling said had been provided by the accused was tested and found to be diamorphine.

## Description and identity of the Accused

44. The corroboration of the identification of the accused Robertson as the perpetrator of the offence can be shown by the following information:

A) the witness Stirling identified "Reece" in her statement as the white male who provided the drugs, threatened her to pay for them, and was waiting in her house while she called the police,

B) the white male arrested at 1 Rosemill Court, Newmills fits the description of "Reece" as described by witness Stirling,

C) the white male arrested at 1 Rosemill Court, Newmills, who provided his name to the victim as 'Reece,' subsequently identified himself upon arrival at the Dunfermline Police Station on April 26, 2020, at 6:44 pm as Thomas Robertson, a British national born on 21 May 1998

D) a certified photograph and certified copy fingerprints of Thomas Robertson are attached at Annex F of this extradition request.

E) the arresting officers have identified the individual in the photograph at Annex F as the individual who they arrested at Rosemill Court, Newmills, who identified himself to the victim as 'Reece' and subsequently provided his identity as Thomas Robertson.

Sheriff of Tayside, Central and Fife at Dunfermline
Date:    30/5/24

Police Sergeant Kris Robertson
Date:    30/5/24

45. I swear that the foregoing deposition contains information provided
to me in the course of police investigation.

Sheriff of Tayside, Central and Fife at Dunfermline
Date:     30 / 5 / 24

Police Sergeant Kris Robertson
Date:     30 / 5 / 24



**<u>ANNEX A:</u>**

1.  Certified Copy Warrant to apprehend THOMAS ROBERTSON



## DOCUMENTARY BACKING SHEET

P.F. NO.:                                      DR20001189

PRODUCTION REG. NO.:                           202003059-31

CASE REFERENCE NO./CRIME NO.                   CF0058630420

CASE DOCUMENT NO. (To be used
ONLY in multiple document cases
i.e. large fraud reports)

DESCRIPTION OF DOCUMENT OR ITEM:    CHS IMAGE – THOMAS
ROBERTSON

WHERE FOUND:                        DUNFERMLINE POLICE

STATION

CASE AGAINST:                       THOMAS ROBERTSON

REPORTING OFFICER:                  KRIS ROBERTSON

WITNESSES WHO CAN IDENTIFY:

NAME (Block Capitals)               SIGNATURE

KRIS ROBERTSON                      _____ 161195

NEIL GRIBBONS                       _____ DC1173

CERTIFICATION OF AUTHENTICATION ATTACHED        YES / NO

BUSINESS DOCkET ATTACHED                        YES / NO

OFFICIAL

Reference:
CF0058630420
DR20001189

Certified copy
- by person in
possession and control
of original

CERTIFICATE OF AUTHENTICATION


I, Kris Robertson being a person in possession and control of the original of the copy
document on which this certificate is endorsed (or to which this certificate is attached)
hereby certify that it is a true copy of the original which is in my possession and
control.


Date: 28/06/2023    (Signed) ...................................


LIST AND DESCRIBE DOCUMENTS

CHS Image – Thomas Robertson


1) True documents held within Criminal History System.





# POLICE SCOTLAND

### DOCUMENTARY BACKING SHEET

P.F. NO.: <u>DR20001189</u>

PRODUCTION REG. NO.: <u>202003059-32</u>

CASE REFERENCE NO./CRIME NO. <u>CF0058630420</u>

CASE DOCUMENT NO. (To be used ONLY in multiple document cases i.e. large fraud reports) _____

DESCRIPTION OF DOCUMENT OR ITEM: <u>FINGERPRINTS – THOMAS ROBERTSON</u>

WHERE FOUND: <u>DUNFERMLINE POLICE STATION</u>

CASE AGAINST: <u>THOMAS ROBERTSON</u>

REPORTING OFFICER: <u>KRIS ROBERTSON</u>

WITNESSES WHO CAN IDENTIFY:

NAME (Block Capitals)                SIGNATURE

<u>KRIS ROBERTSON</u>                _____

<u>NEIL GRIBBONS</u>                _____

_____                _____

CERTIFICATION OF AUTHENTICATION ATTACHED        YES / NO

BUSINESS DOCkET ATTACHED        YES / NO

POLICE
SCOTLAND

DOCUMENTARY BACKING SHEET

| | |
|---|---|
| P.F. NO. | DRC07071784 |
| PRODUCTION REF. NO. | 7030929S-32 |
| CASE FILE / HIGH NO / CRIME NO | CF0063630320 |
| CASE DOCUMENT NO. (To be used ONLY in multiple document cases i.e. large fraud enquiries) | |

DESCRIPTION OF DOCUMENT OR ITEM   FINGERPRINTS – THOMAS
ROBERTSON

| WHERE FOUND | DUNFERMLINE POLICE
STATION |
|---|---|
| CASE AGAINST | THOMAS ROBERTSON |
| REPORTING OFFICER | KIRIS ROBERTSON |

WITNESSES WHO CAN IDENTIFY

| NAME (Block Capitals) | SIGNATURE |
|---|---|
| KIRIS ROBERTSON | |
| NEIL GRIBBONS | |

| CERTIFICATION OF AUTHENTICATION ATTACHED | YES / NO |
|---|---|
| BUSINESS DOCKET ATTACHED | YES / NO |

OFFICIAL

Reference:
CF0058630420
DR20001189

Certified copy
- by person in
possession and control
of original

CERTIFICATE OF AUTHENTICATION

I, Kris Robertson being a person in possession and control of the original of the copy
document on which this certificate is endorsed (or to which this certificate is attached)
hereby certify that it is a true copy of the original which is in my possession and
control.

Date: 07/07/2023          (Signed) ....~~~~~~~....

LIST AND DESCRIBE DOCUMENTS

Fingerprints – Thomas Robertson

1) True documents held by Scottish Police Authority.



REMARKS
Injured or missing fingers.
Additional CR numbers

LEFT PALM

RIGHT PALM

| Input By | |
|---|---|
| Date | |
| FIN/URN Cross Check | |
| Status | R    T |

| | URN | CRO |
|---|---|---|
| Identity Confirmed | Y | Y |
| | N | N |

| TP/MK SENT | Y    N |
|---|---|
| Demos | |
| Closeout | |

TENPRINT IDENTIFICATION OFFICER

URN 7976 3111E

In the Name of
Thomas Robertson

SPA Forensic Services
Fingerprints
CERTIFIED COPY OF
TENPRINT FORM

Scottish Crime Campus,
Forensic Services, Livescan Unit,
Craignethan Drive,
Gartcosh G69 8AE

This is the form FS-PHY-0450F referred to in my certificate of this date under C.P.(S.) Act 1995, Sec 285 (3) as amended, relative to the case against

**FS-PHY-0450F**
Issue No.2, Date: 18th February 2014
Page 2 of 2

SGD

Authorised by Scottish Ministers.    Date

THIS FORM TO BE FORWARDED AS EARLY AS POSSIBLE TO:-

DATE STAMP.

RESTRICTED (When Complete)

**FS-PHY-0450F** Issue No.2, Date: 18th February 2014   Page 1 of 2

## SCOTTISH POLICE AUTHORITY

LANA5M0041519C

| | |
|---|---|
| Ref. No. | PSPLA00960319 |
| Local Ref. | |
| U.R.N. | **S** 179763/17E |

Surname **ROBERTSON**

Aliases Maiden Name

Forename (s) **THOMAS**

D.O.B. **2 1 0 5 1 9 9 8**
D D M M Y Y Y Y

Force Station Code (Of Offence) **74LA**

Home Address **18 BROOMHILL GATE, GLASGOW**

HEALTH AND SAFETY Forms contaminated with blood or other body fluids, or those used to fingerprint persons known or suspected to be suffering from or carriers of communicable diseases, must be sealed in accordance with Health & Safety requirements

Sex  M-Male
**M**  F-Female
U-Unknown

### CERTIFICATE 1   CERTIFICATE UNDER CRIMINAL PROCEDURE (SCOTLAND) ACT 1995 SECTION 284, AS AMENDED

SPA
P/P
USE
ONLY

I (signature) _Fiona c Baxts_ (name printed) _Fiona Baxter_ a person authorised by the Chief Constable, for purpose of section 284(1) of the Criminal Procedure (Scotland) Act 1995 as amended, herby certify the relevant physical data, with the meaning of Section 18 (7A) of said act on this form was taken from

**THOMAS ROBERTSON** (Accused Name) at **11:55** (Time) on **05.03.2019** (Date)

Within **Clydebank** Police office on (a) charge (s) **SEC 2 RTA 1988 VARIOUS RTA OFFENCES**

Taken by _____ No **PCSO** Name to be printed **Andrew Gillen**

Witnessed by _____ No **501177** Name to be printed **KENNY WILSON**

Fingerprint Status

P.N.C. I.D. _____

FOR RECORD OFFICES : SPA USE ONLY

Crr. Summons No | | | | | | | | | | | | C.R.O. No. _____

| 1. R. Thumb. | 2. R. Fore. | 3. R. Middle. | 4. R. Ring. | 5. R. Little. |
|---|---|---|---|---|

Fold

| 6. L. Thumb. | 7. L. Fore. | 8. L. Middle. | 9. L. Ring. | 10. L. Little. |
|---|---|---|---|---|

Fold                                                                Fold

| LEFT HAND. | Plain Prints Of Four Fingers Taken Simultaneously. | Plain Print Left Thumb. | Plain Print Right Thumb. | RIGHT HAND. | Plain Prints Of Four Fingers Taken Simultaneously. |
|---|---|---|---|---|---|

Lexmark MS810

Lexmark MS810 # 20190305-12:22

IN ALL CASES PALM PRINTS SHOULD BE TAKEN OVERLEAF AND ALL RED SECTIONS TO BE COMPLETED BY THE OFFICER TAKING THE PRINTS

RESTRICTED (When Complete)



## DOCUMENTARY BACKING SHEET

P.F. NO.: __DR20001189__

PRODUCTION REG. NO.: __202003059-30__

CASE REFERENCE NO./CRIME NO. __CF0058630420__

CASE DOCUMENT NO. (To be used ONLY in multiple document cases i.e. large fraud reports) _____

DESCRIPTION OF DOCUMENT OR ITEM: __WARRANT – THOMAS ROBERTSON__

_____

_____

WHERE FOUND: __DUNFERMLINE POLICE__

__STATION__

_____

CASE AGAINST: __THOMAS ROBERTSON__

_____

REPORTING OFFICER: __KRIS ROBERTSON__

WITNESSES WHO CAN IDENTIFY:

NAME (Block Capitals)                    SIGNATURE

__KRIS ROBERTSON__                    

__NEIL GRIBBONS__                    

_____

CERTIFICATION OF AUTHENTICATION ATTACHED        YES / NO

BUSINESS DOCkET ATTACHED        YES / NO

OFFICIAL

Reference:
CF0058630420
DR20001189

Certified copy
- by person in
possession and control
of original

CERTIFICATE OF AUTHENTICATION

I, Kris Robertson being a person in possession and control of the original of the copy
document on which this certificate is endorsed (or to which this certificate is attached)
hereby certify that it is a true copy of the original which is in my possession and
control.

Date: 28/06/2023          (Signed) ...................................

LIST AND DESCRIBE DOCUMENTS

Warrant – Thomas Robertson

1) True documents held within Dunfermline Police Station.

# Please obtain the following from the accused on arrest and before charge:-

| | |
|---|---|
| Fingerprints | |
| Handwriting | |
| Blood | |
| DNA | |
| Hair | |
| Viper Capture | |
| Other (please specify) | |

Please also follow the special instructions (if any) set out in the box below.

Special Instructions:

*This is a Sheriff + Jury matter and an early enforcement would be appreciated. Accused is known to be a "dangerous individual"*

**If the accused has not been arrested by** 5\5\23 , please return the Warrant to this office with a full enquiry record of all efforts made to execute the Warrant and if possible an assessment of the prospects of successful execution.

**In the meantime, please provide a copy of the enquiry record in this case on the dates detailed in the boxes below to assist with our warrant review processes.**

The enquiry record must contain details of the date, time, nature and outcome of enquiries to trace the accused and should contain the name and shoulder number of the officers who made the relevant enquiries. It should include details of any individuals of whom enquiries were made and of the information given by them.

## SUBMISSION OF ENQUIRY RECORD

Dates on which copy of enquiry record should be submitted to Procurator Fiscal:-

Category A – Monthly; Category B – 2 monthly; Category C – 3 monthly

| 1 | 4\6\22 | 3 | 4\8\22 |
|---|---|---|---|
| 2 | 4\7\22 | 4 | 4\9\22 |

*et C*

Procurator Fiscal Depute                          Date

_____                    5\5\22

**WARRANT EXECUTION INSTRUCTION**

Issuing Court Dunfermline Sheriff/~~District~~

NAME OF SUBJECT:    THOMAS ROBERTSON
DOB:    21/5/98
PF.REF:    DR 2000 1189

| CATEGORY A – Execute within 21 days | |
|---|---|
| Petition Warrants | |
| Failure to appear at the High Court | |
| Failure to appear in a Sheriff and Jury Court | ✓ |
| Accused presents a substantial risk to the public | |
| Case which involves a substantial sexual element | |
| Agreed as a local priority | |
| | |
| CATEGORY B  - Execute within 28 days | |
| Not a category A warrant but involves possession or use of a weapon | |
| Not a category A warrant but involves racial aggravation or religious prejudice | |
| Not a category A warrant but involves domestic violence | |
| Serious Road Traffic Offence (e.g. dangerous driving, driving whilst disqualified or driving whilst unfit through drink or drugs) | |
| Undue delay warrants in terms of section 136 (3) of the Criminal Procedure (Scotland) Act 1995 unless the statutory time bar falls within 28 days of the date of issue of the warrant when such warrants will be treated as category A warrants | |
| Agreed as category B locally | |
| | |
| CATEGORY C | |
| All other warrants which have been sent for execution but are not categorised as A or B warrants | |

**Please execute the enclosed Warrant as soon as possible unless there are valid reasons for not doing so.**

The Warrant should be executed:-

| | |
|---|---|
| Within the UK | ✓ |
| Within Scotland | |
| Other (please specify) | |

| SCS Case Ref: | SCS/2021–016542 |
| Court Ref: | DNF/2021–001239 |
| PF Ref: | DR20001189–002 |
| Police Ref: | PFC0058630420 |
| SCRO No: | S179763/17E |

Court of the Sheriffdom of TAYSIDE, CENTRAL AND FIFE at DUNFERMLINE on 4th May 2022 before S Duff, Sheriff of said Sheriffdom.

The diet having been called, Her Majesty's Advocate against

**THOMAS ROBERTSON (date of birth: 21/05/1998)**

whose proper domicile of citation is 18, BROOMHILL GATE, GLASGOW, G11 7NU

for the Crime of

1) MISUSE OF DRUGS ACT 1971 S4(3)(B) –
2) MISUSE OF DRUGS ACT 1971 S4(3)(B) –
3) CRIMINAL JUSTICE AND LICENSING (SCOTLAND) ACT 2010 S38(1) –

the said accused failed to appear.

The Court at DUNFERMLINE Grants a warrant under section 102A(2) of the Criminal Procedure (Scotland) Act 1995 in the case of Her Majesty's Advocate against THOMAS ROBERTSON for the apprehension of THOMAS ROBERTSON

By virtue of section 102A(9) of that Act, this warrant implies warrant to officers of law–

(a) to search for and apprehend THOMAS ROBERTSON;
(b) to bring THOMAS ROBERTSON before the court;
(c) in the meantime, to detain THOMAS ROBERTSON in a police station, police cell or other convenient place; and
(d) so far as necessary for the execution of the warrant, to break open shut and lockfast places.

(Signed)



**<u>ANNEX B:</u>**

1.  Indictment against THOMAS ROBERTSON

SHERIFF AND JURY                                    DR20001189
First Diet: 13 April 2021

5    LESLEY FREEGENT, born 17 November 1996, whose domicile of citation has been specified as 35 Kenley Road, Flat 2/1, Paisley
THOMAS ROBERTSON, born 21 May 1998, whose domicile of citation has been specified as 18 Broomhill Gate, Glasgow, G11 7NU

10    you are indicted at the instance of Her Majesty's Advocate, and the charges against you are that

(1) between 19 April 2020 and 23 April 2020, both dates inclusive, at 1
15    Rosemill Court, Newmills, Dunfermline, Fife and elsewhere you LESLEY FREEGENT and THOMAS ROBERTSON were concerned in the supplying of a controlled drug, namely Diamorphine a Class A drug specified in Part 1 of Schedule 2 to the Misuse of Drugs Act 1971 to another or others in contravention of Section 4(1) of the aftermentioned Act;
20    CONTRARY to the Misuse of Drugs Act 1971, Section 4(3)(b);

(2) between 19 April 2020 and 23 April 2020, both dates inclusive, at 1
Rosemill Court, Newmills, Dunfermline, Fife and elsewhere you LESLEY FREEGENT and THOMAS ROBERTSON were concerned in the supplying of a
25    controlled drug, namely Cocaine a Class A drug specified in Part 1 of Schedule 2 to the Misuse of Drugs Act 1971 to another or others in contravention of Section 4(1) of the aftermentioned Act;
CONTRARY to the Misuse of Drugs Act 1971, Section 4(3)(b);

30    and

(3) on 26 April 2020 at 1 Rosemill Court, Newmills, Dunfermline, Fife you LESLEY FREEGENT and THOMAS ROBERTSON did behave in a threatening or abusive manner which was likely to cause a reasonable person to suffer
35    fear or alarm in that you did shout and utter threats of violence towards Pamela Stirling, c/o the Police Service of Scotland, repeatedly demand money from her and threaten to burn down her house unless she paid you said money;
CONTRARY to Section 38(1) of the Criminal Justice and Licensing
40    (Scotland) Act 2010.

BY AUTHORITY OF HER MAJESTY'S ADVOCATE
45

PROCURATOR FISCAL DEPUTE



**<u>ANNEX C:</u>**

1. Statutory provision of the Misuse of Drugs Act 1971, Section 4(3)(b)



# Misuse of Drugs Act 1971

## 1971 CHAPTER 38

*Restrictions relating to controlled drugs etc.*

**4    Restriction of production and supply of controlled drugs.**

(1) Subject to any regulations under section 7 of this Act [**F1**, or any provision made in a temporary class drug order by virtue of section 7A, **]** for the time being in force, it shall not be lawful for a person—

    (a)   to produce a controlled drug; or

    (b)   to supply or offer to supply a controlled drug to another.

(2) Subject to section 28 of this Act, it is an offence for a person—

    (a)   to produce a controlled drug in contravention of subsection (1) above; or

    (b)   to be concerned in the production of such a drug in contravention of that subsection by another.

(3) Subject to section 28 of this Act, it is an offence for a person—

    (a)   to supply or offer to supply a controlled drug to another in contravention of subsection (1) above; or

    (b)   to be concerned in the supplying of such a drug to another in contravention of that subsection; or

    (c)   to be concerned in the making to another in contravention of that subsection of an offer to supply such a drug.

---

**Textual Amendments**

**F1**   Words in s. 4(1) inserted (15.11.2011) by Police Reform and Social Responsibility Act 2011 (c. 13), s. 157(1), **Sch. 17 para. 5**; S.I. 2011/2515, art. 3(g)

**Modifications etc. (not altering text)**

**C1**   S. 4(1)(a) excluded (1.2.2002) by S.I. 2001/3998, **regs. 4**, 8(1), 9(1) (with reg. 2(3))

**C2**   S. 4(1)(b) excluded (1.2.2002) by S.I. 2001/3998, **regs. 6**, 8(2)-(6), 9(2)-(6), 11(1)(2) (with reg. 2(3))

**C3**   S. 4(1)(b) excluded by S.I. 2001/3998, reg. 8(7)(8) (as inserted (15.10.2003) by Misuse of Drugs (Amendment) (No.3) Regulations 2003 (S.I. 2003/2429), regs. 1, **2(5)**)

2

***Changes to legislation:*** There are currently no known outstanding effects for
*the Misuse of Drugs Act 1971, Section 4. (See end of Document for details)*

| | |
|---|---|
| **C4** | S. 4(1)(b) excluded by S.I. 2001/3998, reg. 9(7)(8) (as inserted (15.10.2003) by Misuse of Drugs (Amendment) (No.3) Regulations 2003 (S.I. 2003/2429), regs. 1, **2(6)**) |
| **C5** | S. 4(1)(b) excluded by S.I. 2001/3998, reg. 8(7) (as substituted (14.11.2005) by Misuse of Drugs and the Misuse of Drugs (Supply to Addicts) (amendment) Regulations 2005 (S.I. 2005/2864), regs. 1(1), **7**) |
| **C6** | S. 4(1)(b) excluded by S.I. 2001/3998, reg. 8(7) (as substituted (14.11.2005) by Misuse of Drugs and the Misuse of Drugs (Supply to Addicts) (amendment) Regulations 2005 (S.I. 2005/2864), regs. 1(1), **8**) |
| **C7** | S. 4(2)(3) saved by (E.W.) Criminal Law Act 1977 (c. 45), **Sch. 5 para. 1(2)(b)(i)(ii)** and (S.) Criminal Procedure (Scotland) Act 1975 (c. 21), **Sch. 7B para. 1(2)(b)(i)(ii)** |

> **Changes to legislation:**
> There are currently no known outstanding effects for the Misuse of Drugs Act 1971, Section 4.



**<u>ANNEX D:</u>**

1.   Statutory provision of the Misuse of Drugs Act 1971, Schedule 2

---

**Changes to legislation:** *There are currently no known outstanding effects*
*for the Misuse of Drugs Act 1971, Part I. (See end of Document for details)*

---

# S C H E D U L E S

## SCHEDULE 2

### CONTROLLED DRUGS

#### PART I

##### CLASS A DRUGS

1          The following substances and products, namely:—

[**F1**(a)          Acetorphine.

[**F2**Alfentanil.]

Allylprodine.

Alphacetylmethadol.

Alphameprodine.

Alphamethadol.

Alphaprodine.

Anileridine.

Benzethidine.

Benzylmorphine (3-benzylmorphine).

Betacetylmethadol.

Betameprodine.

Betamethadol.

Betaprodine.

Bezitramide.

Bufotenine.

**F3** ...

**F4** ...

[**F5**Carfentanil.]

Clonitazene.

Coca leaf.

Cocaine.

Desomorphine.

Dextromoramide.

Diamorphine.

Diampromide.

Diethylthiambutene.

[**F6**Difenoxin                    (1-(3-cyano-3,3-diphenylpropyl)-4-
phenylpiperidine-4-carboxylic acid).]

Dihydrocodeinone *O*-carboxymethyloxime.

*Misuse of Drugs Act 1971 (c. 38)*
*SCHEDULE 2 – Controlled Drugs*
*Document Generated: 2022-08-28*

***Changes to legislation:*** *There are currently no known outstanding effects*
*for the Misuse of Drugs Act 1971, Part I. (See end of Document for details)*

[**F7**Dihydroetorphine**]**

Dimenoxadole.

Dimepheptanol.

Dimethylthiambutene.

Dioxaphetyl butyrate.

Diphenoxylate.

Dipipanone.

[**F8**Drotebanol (3,4-dimethoxy-17-methylmorphinan-6b, 14-diol).**]**

Ecgonine, and any derivative of ecgonine which is convertible to ecgonine or to cocaine.

Ethylmethylthiambutene.

[**F2**Eticyclidine.**]**

Etonitazene.

Etorphine.

Etoxeridine.

[**F9**Etryptamine**]**

Fentanyl.

[**F10**Fungus (of any kind) which contains psilocin or an ester of psilocin.**]**

Furethidine.

Hydrocodone.

Hydromorphinol.

Hydromorphone.

Hydroxypethidine.

Isomethadone.

Ketobemidone.

Levomethorphan.

Levomoramide.

Levophenacylmorphan.

Levorphanol.

[**F5**Lofentanil**]**

Lysergamide.

Lysergide and other*N*-alkyl derivatives of lysergamide.

Mescaline.

Metazocine.

Methadone.

Methadyl acetate.

[**F11**Methylamphetamine**]**

Methyldesorphine.

Methyldihydromorphine (6-methyldihydromorphine).

Metopon.

Morpheridine.

Morphine.

Morphine methobromide, morphine*N*-oxide and other pentavalent nitrogen morphine derivatives.

---

***Changes to legislation:*** *There are currently no known outstanding effects*
*for the Misuse of Drugs Act 1971, Part I. (See end of Document for details)*

---

Myrophine.

**F12** . . .

Nicomorphine (3,6-dinicotinoylmorphine).

Noracymethadol.

Norlevorphanol.

Normethadone.

Normorphine.

Norpipanone.

Opium, whether raw, prepared or medicinal.

Oxycodone.

Oxymorphone.

Pethidine.

Phenadoxone.

Phenampromide.

Phenazocine.

[**F13**Phencyclidine.]

Phenomorphan.

Phenoperidine.

Piminodine.

Piritramide.

Poppy-straw and concentrate of poppy-straw.

Proheptazine.

Properidine      (1-methyl-4-phenyl-piperidine-4-carboxylic      acid
isopropyl ester).

Psilocin.

Racemethorphan.

Racemoramide.

Racemorphan.

[**F14**Remifentanil]

[**F2**Rolicyclidine.]

[**F15**Sufentanil.]

[**F16**Tapentadol.]

[**F2**Tenocylidine.]

Thebacon.

Thebaine.

[**F15**Tilidate.]

Trimeperidine.

[**F17**(6a*R*,9*R*)-4-acetyl-*N,N*-diethyl-7-methyl-4,6,6a,7,8,9-
hexahydroindolo[4,3-*fg*]quinoline-9-carboxamide (ALD-52).]

[**F18**4-Bromo-2,5-dimethoxy-a-methylphenethylamine].

4-Cyano-2-dimethylamino-4,4-diphenylbutane.

4-Cyano-1-methyl-4-phenyl-piperidine.

[**F19**1-Cyclohexyl-4-(1,2-diphenylethyl)piperazine (MT-45).]

[**F20**3,4-dichloro-*N*-[[1-
(dimethylamino)cyclohexyl]methyl]benzamide (AH-7921);]

[**F21**3,4-dichloro-*N*-[2-(dimethylamino)cyclohexyl]-N-
methylbenzamide (U-47,700).]

[**F22**(6aR,9R)        *R*,9        *R*)-      *N,N*-diethyl-7-allyl-4,6,6a,7,8,9-
hexahydroindolo[4,3-*fg*]quinoline-9-carboxamide (AL-LAD);
(6aR,9R)                    *R*,9*R*)-N,N-diethyl-7-ethyl-4,6,6a,7,8,9-
hexahydroindolo[4,3-*fg*]quinoline-9-carboxamide (ETH-LAD);
(6aR,9R)*R*,9*R*)-N,N-diethyl-7-propyl-4,6,6a,7,8,9-
hexahydroindolo[4,3-*fg*]quinoline-9-carboxamide (PRO-LAD).]

*N,N*-Diethyltryptamine.

[**F23**2,4-dimethylazetidinyl{(6a*R*,9*R*)-7-methyl-4,6,6a,7,8,9-
hexahydroindolo[4,3- *fg*]quinolin-9-yl}methanone (LSZ).]

*N,N*-Dimethyltryptamine.

2,5-Dimethoxy-a,4-dimethylphenethylamine.

[**F24**N-Hydroxy-tenamphetamine.]

1-Methyl-4-phenylpiperidine-4-carboxylic acid.

2-Methyl-3-morpholino-1, 1-diphenylpropanecarboxylic acid.

[**F25**4-Methyl-aminorex]

[**F26**4-Methyl-5-(4-methylphenyl)-4,5-dihydrooxazol-2-amine  (4,4'-
DMAR).]

4-Phenylpiperidine-4-carboxylic acid ethyl ester.

[**F27**(b)    any compound (not being a compound for the time being specified in sub-
paragraph (a) above) structurally derived from tryptamine or from a ring-
hydroxy tryptamine by modification in any of the following ways, that is
to say—

(i) by substitution at the nitrogen atom of the sidechain to any extent
with alkyl or alkenyl substituents, or by inclusion of the nitrogen
atom of the side chain (and no other atoms of the side chain) in a
cyclic structure;

(ii) by substitution at the carbon atom adjacent to the nitrogen atom of
the side chain with alkyl or alkenyl substituents;

(iii) by substitution in the 6-membered ring to any extent with alkyl,
alkoxy, haloalkyl, thioalkyl, alkylenedioxy, or halide substituents;

(iv) by substitution at the 2-position of the tryptamine ring system with
an alkyl substituent;]

[**F28**(ba)    the following phenethylamine derivatives, namely:—

Allyl( *a* -methyl-3,4-methylenedioxyphenethyl)amine

2-Amino-1-(2,5-dimethoxy-4-methylphenyl)ethanol

2-Amino-1-(3,4-dimethoxyphenyl)ethanol

Benzyl( *a* -methyl-3,4-methylenedioxyphenethyl)amine

4-Bromo- *b* ,2,5-trimethoxyphenethylamine

*N* -(4- *sec* -Butylthio-2,5-dimethoxyphenethyl)hydroxylamine

Cyclopropylmethyl( *a* -methyl-3,4-methylenedioxyphenethyl)amine

2-(4,7-Dimethoxy-2,3-dihydro-1 *H* -indan-5-yl)ethylamine

2-(4,7-Dimethoxy-2,3-dihydro-1 *H* -indan-5-yl)-1-methylethylamine

2-(2,5-Dimethoxy-4-methylphenyl)cyclopropylamine

*Changes to legislation:* There are currently no known outstanding effects
for the Misuse of Drugs Act 1971, Part I. (See end of Document for details)

2-(1,4-Dimethoxy-2-naphthyl)ethylamine

2-(1,4-Dimethoxy-2-naphthyl)-1-methylethylamine

*N* -(2,5-Dimethoxy-4-propylthiophenethyl)hydroxylamine

2-(1,4-Dimethoxy-5,6,7,8-tetrahydro-2-naphthyl)ethylamine

2-(1,4-Dimethoxy-5,6,7,8-tetrahydro-2-naphthyl)-1-methylethylamine

*a* , *a* -Dimethyl-3,4-methylenedioxyphenethylamine

*a* , *a* -Dimethyl-3,4-methylenedioxyphenethyl(methyl)amine

Dimethyl( *a* -methyl-3,4-methylenedioxyphenethyl)amine

*N* -(4-Ethylthio-2,5-dimethoxyphenethyl)hydroxylamine

4-Iodo-2,5-dimethoxy- *a* -methylphenethyl(dimethyl)amine

2-(1,4-Methano-5,8-dimethoxy-1,2,3,4-tetrahydro-6-naphthyl)ethylamine

2-(1,4-Methano-5,8-dimethoxy-1,2,3,4-tetrahydro-6-naphthyl)-1-methylethylamine

2-(5-Methoxy-2,2-dimethyl-2,3-dihydrobenzo[ *b* ]furan-6-yl)-1-methylethylamine

2-Methoxyethyl( *a* -methyl-3,4-methylenedioxyphenethyl)amine

2-(5-Methoxy-2-methyl-2,3-dihydrobenzo[ *b* ]furan-6-yl)-1-methylethylamine

*b* -Methoxy-3,4-methylenedioxyphenethylamine

1-(3,4-Methylenedioxybenzyl)butyl(ethyl)amine

1-(3,4-Methylenedioxybenzyl)butyl(methyl)amine

2-( *a* -Methyl-3,4-methylenedioxyphenethylamino)ethanol

*a* -Methyl-3,4-methylenedioxyphenethyl(prop-2-ynyl)amine

*N* -Methyl- *N* -( *a* -methyl-3,4-methylenedioxyphenethyl)hydroxylamine

*O* -Methyl- *N* -( *a* -methyl-3,4-methylenedioxyphenethyl)hydroxylamine

*a* -Methyl-4-(methylthio)phenethylamine

*b* ,3,4,5-Tetramethoxyphenethylamine

*b* ,2,5-Trimethoxy-4-methylphenethylamine; ]

[ **F29**(c)  any compound (not being methoxyphenamine or a compound for the time being specified in sub-paragraph (a) above) structurally derived from phenethylamine an *N* -alkylphenethylamine,a-methylphenethylamine, an *N* -alkyl-a-methylphenethylamine,a-ethylphenethylamine, or an *N* -alkyl-a-ethylphenethylamine by substitution in the ring to any extent with alkyl, alkoxy, alkylenedioxy or halide substituents, whether or not further substituted in the ring by one or more other univalent substituents. ]

[ **F30**(d)  any compound (not being a compound for the time being specified in sub-paragraph (a) above) structurally derived from fentanyl by modification in any of the following ways, that is to say,

(i) by replacement of the phenyl portion of the phenethyl group by any heteromonocycle whether or not further substituted in the heterocycle;

(ii) by substitution in the phenethyl group with alkyl, alkenyl, alkoxy, hydroxy, halogeno, haloalkyl, amino or nitro groups;

(iii) by substitution in the piperidine ring with alkyl or alkenyl groups;

    (iv) by substitution in the aniline ring with alkyl, alkoxy, alkylenedioxy, halogeno or haloalkyl groups;

    (v) by substitution at the 4-position of the piperidine ring with any alkoxycarbonyl or alkoxyalkyl or acyloxy group;

    (vi) by replacement of the N-propionyl group by another acyl group;

(e)  any compound (not being a compound for the time being specified in sub-paragraph (a) above) structurally derived from pethidine by modification in any of the following ways, that is to say,

    (i) by replacement of the 1-methyl group by an acyl, alkyl whether or not unsaturated, benzyl or phenethyl group, whether or not further substituted;

    (ii) by substitution in the piperidine ring with alkyl or alkenyl groups or with a propano bridge, whether or not further substituted;

    (iii) by substitution in the 4-phenyl ring wiith alkyl, alkoxy, aryloxy, halogeno or haloalkyl groups;

    (iv) by replacement of the 4-ethoxycarbonyl by any other alkoxycarbonyl or any alkoxyalkyl or acyloxy group;

    (v) by formation of an N-oxide or of a quaternary base.]

[**F31**(f)  any compound (not being benzyl(α-methyl-3,4-methylenedioxyphenethyl)amine) structurally derived from mescaline, 4-bromo-2,5-dimethoxy-α-methylphenethylamine, 2,5-dimethoxy-α,4-dimethylphenethylamine, *N*-hydroxytenamphetamine, or a compound specified in sub-paragraph (ba) or (c) above, by substitution at the nitrogen atom of the amino group with a benzyl substituent, whether or not substituted in the phenyl ring of the benzyl group to any extent.]

**Textual Amendments**

F1   "(a)" inserted by S.I. 1977/1243, **art. 3(a)**
F2   Word inserted by S.I. 1984/859, **art. 2(2)**
F3   Words in Sch. 2 Pt. 1 para. 1(a) deleted (29.1.2004) by The Misuse of Drugs Act 1971 (Modification) (No. 2) Order 2003 (S.I. 2003/3201), **art. 2(2)**
F4   Words in Sch. 2 Pt. 1 para. 1(a) deleted (29.1.2004) by The Misuse of Drugs Act 1971 (Modification) (No. 2) Order 2003 (S.I. 2003/3201), **art. 2(2)**
F5   Word inserted by S.I. 1986/2230, **art. 2(2)(a)**
F6   Word inserted by S.I. 1975/421, **art. 3**
F7   Word in Sch. 2 Pt. 1 para. 1(a) inserted (1.7.2003) by The Misuse of Drugs Act 1971 (Modification) Order 2003 (S.I. 2003 /1243), art. 2(2)(a)
F8   Word inserted by S.I. 1973/771, **art. 2**
F9   Word in Sch. 2 Pt. 1 para. 1(a) inserted (1.5.1998) by S.I. 1998/750, **art. 2(2)**
F10  Words in Sch. 2 Pt. 1 para. 1 inserted (18.7.2005) by Drugs Act 2005 (c. 17), **s. 21**
F11  Word in Sch. 2 Pt. 1 para. 1(a) inserted (18.1.2007) by The Misuse of Drugs Act 1971 (Amendment) Order 2006 (S.I. 2006/3331), **art. 2(1)**
F12  Words repealed by S.I. 1973/771, **art. 2**
F13  Word inserted by S.I. 1979/299, **art. 2**
F14  Word in Sch. 2 Pt. 1 para. 1(a) inserted (1.7.2003) by The Misuse of Drugs Act 1971 (Modification) Order 2003 (S.I. 2003 /1243), art. 2(2)(b)
F15  Word inserted by S.I. 1983/765, **art. 2(a)**
F16  Word in Sch. 2 Pt. 1 para. 1(a) inserted (28.3.2011) by The Misuse of Drugs Act 1971 (Amendment) Order 2011 (S.I. 2011/744), **arts. 1(1)**, 2

**F17** Words in Sch. 2 Pt. 1 para. 1(a) inserted (7.1.2015) by The Misuse of Drugs Act 1971 (Amendment) (No. 2) Order 2014 (S.I. 2014/3271), **art. 3(a)**

**F18** Words inserted by S.I. 1975/421, **art. 3**

**F19** Words in Sch. 2 Pt. 1 para. 1(a) inserted (11.3.2015) by The Misuse of Drugs Act 1971 (Amendment) Order 2015 (S.I. 2015/215), **art. 3(a)**

**F20** Words in Sch. 2 Pt. 1 para. 1(a) inserted (7.1.2015) by The Misuse of Drugs Act 1971 (Amendment) (No. 2) Order 2014 (S.I. 2014/3271), **art. 3(b)**

**F21** Words in Sch. 2 Pt. 1 para. 1(a) inserted (31.5.2017) by The Misuse of Drugs Act 1971 (Amendment) Order 2017 (S.I. 2017/634), **art. 3**

**F22** Words in Sch. 2 Pt. 1 para. 1(a) inserted (7.1.2015) by The Misuse of Drugs Act 1971 (Amendment) (No. 2) Order 2014 (S.I. 2014/3271), **art. 3(b)**

**F23** Words in Sch. 2 Pt. 1 para. 1(a) inserted (7.1.2015) by The Misuse of Drugs Act 1971 (Amendment) (No. 2) Order 2014 (S.I. 2014/3271), **art. 3(c)**

**F24** Word inserted by S.I. 1990/2589, **art. 2(a)(i)**

**F25** Word inserted by S.I. 1990/2589, **art. 2(a)(ii)**

**F26** Words in Sch. 2 Pt. 1 para. 1(a) inserted (11.3.2015) by The Misuse of Drugs Act 1971 (Amendment) Order 2015 (S.I. 2015/215), **art. 3(b)**

**F27** Sch. 2 Pt. 1 para. 1(b) substituted (7.1.2015) by The Misuse of Drugs Act 1971 (Amendment) (No. 2) Order 2014 (S.I. 2014/3271), **art. 4**

**F28** Sch. 2 Pt. I para. 1(ba) inserted (1.2.2002) by The Misuse of Drugs Act 1971 (Modification) Order 2001 (S.I. 2001/3932), **art. 2(2)**

**F29** Sch. 2 Pt. I para. 1(b)(c) added by S.I. 1977/1243, **art. 3(b)**

**F30** Sch. 2 Pt. I para. 1(d)(e) added by S.I. 1986/2230, **art. 2(2)(b)**

**F31** Sch. 2 Pt. 1 para. 1(f) inserted (10.6.2014) by The Misuse of Drugs Act 1971 (Ketamine etc.) (Amendment) Order 2014 (S.I. 2014/1106), **art. 3**

2  Any stereoisomeric form of a substance for the time being specified in paragraph 1 above not being dextromethorphan or dextrorphan.

3  Any ester or ether of a substance for the time being specified in paragraph 1 or 2 above [**F32**not being a substance for the time being specified in Part II of this Schedule].

**Textual Amendments**

**F32** Words inserted by S.I. 1973/771, **art. 2**

4  Any salt of a substance for the time being specified in any of paragraphs 1 to 3 above.

5  Any preparation or other product containing a substance or product for the time being specified in any of paragraphs 1 to 4 above.

6  Any preparation designed for administration by injection which includes a substance or product for the time being specified in any of paragraphs 1 to 3 of Part II of this Schedule.

8

**Changes to legislation:**
There are currently no known outstanding effects for the Misuse of Drugs Act 1971, Part I.



**ANNEX E:**

1. Statutory provision of the Criminal Justice and Licensing (Scotland) Act 2010, Section 38

***Changes to legislation:*** *There are currently no known outstanding effects for the Criminal Justice and Licensing (Scotland) Act 2010, Section 38. (See end of Document for details)*



# Criminal Justice and Licensing (Scotland) Act 2010

### 2010 asp 13

**PART 2**

CRIMINAL LAW

*Threatening or abusive behaviour*

**38**      **Threatening or abusive behaviour**

(1) A person ("A") commits an offence if—

    (a)    A behaves in a threatening or abusive manner,

    (b)    the behaviour would be likely to cause a reasonable person to suffer fear or alarm, and

    (c)    A intends by the behaviour to cause fear or alarm or is reckless as to whether the behaviour would cause fear or alarm.

(2) It is a defence for a person charged with an offence under subsection (1) to show that the behaviour was, in the particular circumstances, reasonable.

(3) Subsection (1) applies to—

    (a)    behaviour of any kind including, in particular, things said or otherwise communicated as well as things done, and

    (b)    behaviour consisting of—

         (i) a single act, or

         (ii) a course of conduct.

(4) A person guilty of an offence under subsection (1) is liable—

    (a)    on conviction on indictment, to imprisonment for a term not exceeding 5 years, or to a fine, or to both, or

    (b)    on summary conviction, to imprisonment for a term not exceeding 12 months, or to a fine not exceeding the statutory maximum, or to both.

2

*__Changes to legislation:__ There are currently no known outstanding effects for the Criminal*
*Justice and Licensing (Scotland) Act 2010, Section 38. (See end of Document for details)*

**Commencement Information**

I1     S. 38 in force at 6.10.2010 by S.S.I. 2010/339, **art. 2**

**Changes to legislation:**
There are currently no known outstanding effects for the Criminal Justice and Licensing (Scotland) Act 2010, Section 38.



**ANNEX F:**

1. Certified copy photograph of THOMAS ROBERTSON
2. Certified copy fingerprints of THOMAS ROBERTSON